## ABATE ET AL. *v.* MUNDT ET AL.

No. 71.  Argued November 19, 1970—Decided June 7, 1971

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, WHITE, and BLACKMUN, JJ., joined. HARLAN, J., filed a statement concurring in the result. STEWART, J., concurred in the judgment. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS, J., joined, *post*, p. 187.

*Frank P. Barone* argued the cause and filed a brief for petitioner Abate.  *Doris Friedman Ulman* argued the cause and filed a brief for petitioners Molof et al.  *Paul H. Rivet* argued the cause and filed a brief for petitioners O'Sullivan et al.

*J. Martin Cornell* argued the cause for respondents. With him on the brief was *Arthur J. Prindle.*

*Louis J. Lefkowitz,* Attorney General, *Ruth Kessler Toch,* Solicitor General, and *Robert W. Imrie,* Assistant Attorney General, filed a brief for the State of New York as *amicus curiae.*

Mr. Justice Marshall delivered the opinion of the Court.

In this case, petitioners challenge the constitutionality of a reapportionment plan proposed in response to both federal and state court findings of malapportionment in Rockland County, New York. The Court of Appeals of the State of New York upheld the plan. We affirm.

For more than 100 years, Rockland County was governed by a board of supervisors consisting of the supervisors of each of the county's five constituent towns. This county legislature was not separately elected; rather, its members held their county offices by virtue of their election as town supervisors—a pattern that typified New York county government. The result has been a local structure in which overlapping public services are provided by the towns and their county working in close cooperation. For example, in Rockland County the towns adopt their own budgets and submit them to the county which levies taxes. These taxes are based on real property assessments established by the towns but equalized by the county board. Similarly, public services such as waste disposal and snow removal are provided through cooperative efforts among the municipalities. There is no indication that these joint efforts have declined in importance; in fact, respondents strenuously urge that the county's rapidly expanding population has amplified the need for town and county coordination in the future.

The county's increased population also produced severe malapportionment—so severe that, in 1966, a federal district court required that the county board submit a reapportionment plan to the Rockland County voters, *Lodico* v. *Board of Supervisors,* 256 F. Supp. 440 (SDNY). Pursuant to that order, three different plans were devised and submitted to the electorate; but each was rejected at the polls. The present action was brought in 1968 to compel the board to reapportion. After its

initial proposal was rejected by the New York courts, the board submitted the plan that is the subject of this decision.

The challenged plan, based on 1969 population figures, provides for a county legislature composed of 18 members chosen from five legislative districts. These districts exactly correspond to the county's five constituent towns. Each district is assigned its legislators according to the district's population in relation to the population of the smallest town, Stony Point. Stony Point has a population of 12,114 and is assigned one representative in the county legislature. The number of representatives granted the other districts is determined by dividing the population of each by the population of the smallest town. Fractional results of the computation are rounded to the nearest integer, and this need to round off "fractional representatives" produces some variations among districts in terms of population per legislator. Under 1969 population figures, the Orangetown district is the most "underrepresented" (7.1%); while Clarkstown is the most "overrepresented" (4.8%). Thus, the plan presently produces a total deviation from population equality of 11.9%.[1] Petitioners attack these deviations as unconstitutional.[2]

------

[1] All of the population figures and percentage deviations are:

| District | Population* | Number of Representatives | Percentage** Deviations |
|---|---|---|---|
| Stony Point | 12,114 | 1 | 0.3 |
| Haverstraw | 23,676 | 2 | 2.5 |
| Orangetown | 52,080 | 4 | —7.1 |
| Clarkstown | 57,883 | 5 | 4.8 |
| Ramapo | 73,051 | 6 | —0.2 |

*1969 Population data.

**(—) refers to "underrepresented."

[2] Petitioners also attack the plan's use of multi-member districts. However, they have not shown that these multi-member districts, by themselves, operate to impair the voting strength of particular racial or political elements of the Rockland County voting population, see *Burns* v. *Richardson,* 384 U. S. 73, 88 (1966).

It is well established that electoral apportionment must be based on the general principle of population equality and that this principle applies to state and local elections, *Avery* v. *Midland County,* 390 U. S. 474, 481 (1968). "Mathematical exactness or precision is hardly a workable constitutional requirement," *Reynolds* v. *Sims,* 377 U. S. 533, 577 (1964), but deviations from population equality must be justified by legitimate state considerations, *Swann* v. *Adams,* 385 U. S. 440, 444 (1967). Because voting rights require highly sensitive safeguards, this Court has carefully scrutinized state interests offered to justify deviations from population equality.

In assessing the constitutionality of various apportionment plans, we have observed that viable local governments may need considerable flexibility in municipal arrangements if they are to meet changing societal needs, *Sailors* v. *Board of Education,* 387 U. S. 105, 110–111 (1967), and that a desire to preserve the integrity of political subdivisions may justify an apportionment plan which departs from numerical equality. *Reynolds* v. *Sims, supra,* at 578. These observations, along with the facts that local legislative bodies frequently have fewer representatives than do their state and national counterparts and that some local legislative districts may have a much smaller population than do congressional and state legislative districts, lend support to the argument that slightly greater percentage deviations may be tolerable for local government apportionment schemes, cf. *ibid.* Of course, this Court has never suggested that certain geographic areas or political interests are entitled to disproportionate representation. Rather, our statements have reflected the view that the particular circumstances and needs of a local community as a whole may sometimes justify departures from strict equality.

Accordingly, we have underscored the danger of apportionment structures that contain a built-in bias tending

to favor particular geographic areas or political interests or which necessarily will tend to favor, for example, less populous districts over their more highly populated neighbors, see *Hadley* v. *Junior College District*, 397 U. S. 50, 57–58 (1970). In this case, we have no such indigenous bias; there is no suggestion that the Rockland County plan was designed to favor particular groups. It is true that the existence of any deviations from strict equality means that certain districts are advantaged at that point in time; but, under this plan, changing demographic patterns may shift electoral advantages from one town to another.[3]

The mere absence of a built-in bias is not, of course, justification for a departure from population equality. In this case, however, Rockland County defends its plan by asserting the long history of, and perceived need for, close cooperation between the county and its constituent towns. The need for intergovernmental coordination is often greatest at the local level, and we have already commented on the extensive functional interrelationships between Rockland County and its towns. But because almost all governmental entities are interrelated in numerous ways, we would be hesitant to accept this justification by itself. To us, therefore, it is significant that Rockland County has long recognized the advantages of having the same individuals occupy the governing positions of both the county and its towns. For over 100 years, the five town supervisors were the only members of the county board, a system that necessarily fostered extensive interdependence between the towns and their county government. When population shifts required that some towns receive a greater portion of seats on the

---

[3] Naturally, we express no opinion on the contention that, in future years, the Rockland County plan may produce substantially greater deviations than presently exist. Such questions can be answered if and when they arise.

county legislature, Rockland County responded with a plan that substantially remedies the malapportionment and that, by preserving an exact correspondence between each town and one of the county legislative districts, continues to encourage town supervisors to serve on the county board.

We emphasize that our decision is based on the long tradition of overlapping functions and dual personnel in Rockland County government and on the fact that the plan before us does not contain a built-in bias tending to favor particular political interests or geographic areas. And nothing we say today should be taken to imply that even these factors could justify substantially greater deviations from population equality. But we are not prepared to hold that the Rockland County reapportionment plan violates the Constitution, and, therefore, we affirm.

MR. JUSTICE HARLAN concurs in the result for the reasons stated in his separate opinion in *Whitcomb* v. *Chavis, ante,* p. 165.

MR. JUSTICE STEWART concurs in the judgment.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS joins, dissenting.

The Court today reaffirms all of the principles of *Reynolds* v. *Sims,* 377 U. S. 533 (1964), and its progeny but refuses, for a combination of reasons unpersuasive to me, to apply those principles to this apportionment scheme. I believe that our recent decisions in *Avery* v. *Midland County,* 390 U. S. 474 (1968); *Kirkpatrick* v. *Preisler,* 394 U. S. 526 (1969), and *Wells* v. *Rockefeller,* 394 U. S. 542 (1969), require reversal and I therefore dissent.

The Court holds that "a desire to preserve the integrity of political subdivisions may justify an apportionment plan which departs from numerical equality. *Reynolds*

v. *Sims, supra,* at 578." *Ante,* at 185. The Court's reliance on *Reynolds* is misplaced. We said there that "it may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting." 377 U. S., at 578. But we warned that "[t]o do so would be constitutionally valid, *so long as* the resulting apportionment was one based substantially on population and the equal-population principle was not diluted in *any* significant way." *Ibid.* (emphasis added). Moreover, the Court did not at that point in time "deem it expedient . . . to attempt to spell out any precise constitutional tests." We have done so since.

In *Kirkpatrick* v. *Preisler, supra,* we explained that because "[t]oleration of even small deviations detracts from" the constitutional command of "equal representation for equal numbers of people," only those "limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown" are permissible. 394 U. S., at 531. "[T]he State must justify each variance, no matter how small." *Ibid.* On the record presented here it is clear that such a good-faith effort has not been made. Nor can it be said that sufficient justification has been demonstrated for an 11.9% deviation from voting equality.

The plan approved here allegedly represents as close to mathematical exactness as is possible without changing existing political boundaries or using weighted or fractional votes. But a plan devised under these constraints is not devised in the good-faith effort that the Constitution requires. In *Wells* v. *Rockefeller, supra,* we struck down a similar plan. We held that an attempt to maintain existing county lines was insufficient justification for a 12.1% variance. In explanation we stated that an attempt "to keep regions with distinct interests intact"

was insufficient because to accept such a justification "would permit groups of districts with defined interest orientations to be overrepresented at the expense of districts with different interest orientations." 394 U. S., at 546. That is precisely what we are dealing with here. The attempt to maintain existing town lines has resulted in a variance from equality of 11.9%. I cannot believe that a 0.2% differential is the determining factor in approving this apportionment scheme.

The Court explains that it is, rather, a combination of factors that dictates this result, and that among them is the fact that New York has a long history of maintaining the integrity of existing counties. It is not clear to me why such a history, no matter how protracted, should alter the constitutional command to make a good-faith effort to achieve equality of voting power as near to mathematical exactness as is possible.

Today's result cannot be excused by asserting that local governments are somehow less important than national and state governments. We have already fully applied the principle of one man, one vote to local polities because "the States universally leave much policy and decisionmaking to their governmental subdivisions. . . . In a word, institutions of local government have always been a major aspect of our system, and their responsible and responsive operation is today of increasing importance to the quality of life of more and more of our citizens." *Avery* v. *Midland County,* 390 U. S., at 481.

It is clear to me that none of the factors relied upon by the Court today can, singly or in combination, justify this variation. Obviously no other local apportionment scheme can possibly present the same combination of factors relied on by the Court today. In that sense this decision can have little or no precedential value. Nevertheless, I cannot help but regret even this small departure from the basic constitutional concept of one man, one vote.