James D. SEWELL et al.

v.

ST. TAMMANY PARISH POLICE JURY and Malcolm T. Stein, Sr., its President, et al.

Civ. A. No. 69–1271.

United States District Court, E. D. Louisiana, New Orleans Division.

July 21, 1971.

Martin A. Smith, Jr., Slidell, La., for plaintiffs.

Woodrow W. Erwin, Dist. Atty., for 22nd Judicial District, Franklinton, La., Julian J. Rodrigue, Asst. Dist. Atty., Covington, La., for defendants.

C. Emmett Pugh, Martin L. C. Feldman, New Orleans, La., for intervenor, St. Tammany Parish Republican Executive Committee.

## MEMORANDUM OPINION AND ORDER

HEEBE, District Judge.

In June of 1969 the plaintiffs sued the governing authority of St. Tammany Parish to force reapportionment based on the "one man, one vote" principle. In July of that year the plaintiffs and defendants entered into a consent judgment which, although not reapportioning

the members, put into effect a weighted vote system based on the 1960 census.

In May of 1971 the plaintiffs again challenged the existing apportionment scheme based on the 1960 census because the 1970 census information was available (although technically unofficial), and the qualifying dates for police jurors would expire on or before August 8, 1971. The Court held a hearing on June 4, 1971, at which hearing the plaintiffs filed two alternative plans and the defendant police jury filed their single plan. Another hearing was held on June 22, 1971, at which time the attorneys advised the Court that no additional plans would be submitted. On July 7, 1971, the St. Tammany Parish Republican Executive Committee and its chairman intervened as defendants and submitted their plans.

Under the prior apportionment scheme, St. Tammany Parish was comprised of ten wards with fourteen police jurors.

*Plan submitted by the police jury.*

This plan was adopted by a formal resolution on May 11, 1971, and would consist of four multi-member districts. The new districts were created by combining former political wards.

District A—Population 9,055—to be represented by two members (now comprised of former Wards 1 and 4)

District B—Population 18,688—to be represented by four members (now comprised of former Wards 2, 3, 5 and 10)

District C—Population 14,075—to be represented by three members (now comprised of former Wards 6 and 8)

District D—Population 21,767—to be represented by five members (now comprised of former Wards 7 and 9)

The total parish population, according to the information obtainable from the 1970 census, is 63,585. The total number of police jurors in St. Tammany Parish is 14. Therefore, the number of persons per juror according to the 1970 census is 4,542. The percentage of deviation per member in District A is −0.31, in District B is +2.86, in District C is +3.30, and in District D is −4.14. Therefore, the total span of deviation in this plan is 7.44.

There were two plans submitted by the plaintiffs—Plan A and Plan B.

*Plaintiffs' Plan A.*

This plan consists of five election districts, two of which would be single-member districts and the other three would be multi-member districts. One of the multi-member districts would have seven members, or half of the entire police jury. These election districts seek to preserve the old ward lines but add to or subtract from existing wards enumeration districts in order to more exactly comply with the "one man, one vote" principle. In this plan, the greatest deviation is a −.83 and a +.24, for a final deviation of 1.07.

*Plaintiffs' Plan B.*

This plan is similar to that adopted by the police jury. Plan B, in addition to requiring the jurors to be members of their districts and to be elected from those districts, would require the police juror to be elected on a parish-wide basis.

*Intervenor's Plan.*

The intervenor's plan would divide the parish into eleven voting districts—nine single-member districts and two multi-member districts, one district having three members and the other district having two. The largest deviation is a +4.9 and the smallest is a −5.9, for a total deviation of 10.8. The intervenors also submitted alternate plans whereby this larger deviation would be reduced by combining a multi-member district with a single-member district, or by splitting a multi-member district into two single-member districts, but even under these alternate plans the maximum deviation would be a +4.9 and

a −3.8, for a total deviation of 8.7. The intervenors point out that under their plan one single-member district would have a black majority and another single-member district would have a substantial black population (43%).

For representative government to be expressive of the true will of all the people, the electorate must have equal voting power. Thus, where congressional districts within a state were so malapportioned that the voters in one district did not have the same voting strength that voters in another district had, such apportionment scheme was held to violate the Constitutional mandate of "one man, one vote." Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

 This principle of "one man, one vote" is also applicable to representation in state legislative bodies, Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); local governing bodies, Avery v. Midland, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); Hadley v. Jr. College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); and police juries within Louisiana, Simon v. Landry, 286 F.Supp. 60 (W.D.La.1968).

 In reviewing apportionment plans, the ideal goal is perfect representation. Reapportionment need not be done with mathematical exactness, but as nearly as practicable. In reapportioning for congressional districts, this " 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality [and] [u]nless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small." Kirkpatrick v. Preisler, 394 U.S. 526, at pp. 530–531, 89 S.Ct. 1225, at p. 1229, 22 L.Ed.2d 519 (1968). The same rule applies to apportionment of state legislatures, Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), and to local legislative bodies. See, Hadley v. Jr.

College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). Neither can the state rely on any *a priori de minimus* variation of any given per cent in formulating its apportionment ordinance. Kirkpatrick v. Preisler, *supra*. To say an apportionment plan has a maximum deviation of only 7%, 3% or 1% is to show its imperfection and not to hold it up for commendation. However, very few apportionment plans will achieve the ideal of 0% deviation. Accordingly, the Court looks to see whether there is substantial compliance with the "one man, one vote" principle and has sustained a local governmental apportionment scheme with a 12% variation. Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

 While it is true that the state must justify any per cent of population deviation per elected official, it is also true that " . . . legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." Reynolds v. Sims, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1963). Thus, where the state has expressed reasons why a population deviation is necessary, the challenger of a legislatively enacted apportionment statute has the burden of proving its unconstitutionality. In Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), the Court, after ruling that multi-member districts were not *per se* unconstitutional, wrote

" . . . we have insisted that the challenger carry the burden of proving that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements."

 The police jury plan under review provides for four multi-member districts while the plan proposed by the intervenors seeks, basically, single-mem-

ber representation. Under one variation of this plan, eleven single-member districts and one three-member district would exist, with a total deviation of 11.7; under another variation, nine single-member districts and two multi-member districts would exist, with a total deviation of 7.8. The total deviations in these plans are greater than the deviations in the police jury plan. The Court finds that intervenors have not shown, with concrete factual evidence, that the multi-member districts dilute or cancel the voting strength of any existing racial or political element. Therefore, the Court rejects intervenor's proposed plan.[1]

Plaintiff's Plan A proposes five election districts, two single-member districts and three multi-member districts. One multi-member district would elect seven of the fourteen police jurors, for 50% of all elected officials. In Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), the Court spoke of the enhanced tendency of a multi-member district to minimize the voting strength of an identifiable group of voters especially ". . . when the district is large and elects substantial proportion of the seats . . . . " The Chavis Court did not dispute the mathematical theory that ". . . to increase legislative seats in proportion to increased population gives undue voting power to the voter in the multi-member district since he has more chances to determine election outcomes than does the voter in the single-member district." The Chavis Court held that the challenger of an existing legislative apportionment scheme had the burden of proving in reality this theoretical formula. Plan A is not legislatively an adopted scheme, and the Court does not require the police jury to disprove the proposed plan of the plaintiff. The

Court is reluctant to adopt a plan which carries such a potential for diluting the "one man, one vote" principle.

Plan B is the same as that submitted by the police jury with the additional requirement that all fourteen jurors run at large in the parish. Inasmuch as Plan B has the same percentage of deviation as the police jury plan, it has no mathematical advantage to recommend it. Neither was Plan B legislatively enacted. Therefore, this Court rejects Plan B.

In Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1963), the Court stated:

"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme . . . . Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen . . . ." At 578–579, 84 S.Ct. at 1390.

The police jury plan meets these criteria. The police jury plan was formulated by incorporating intact former wards, the pre-existing political subdivisions. The plan does provide for substantial equality of population among the various districts. The total deviation of 7.44, while short of ideal, does not substantially dilute the voters' rights. In Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), the Court held that a reapportionment plan which had a total deviation of 12%, in the total circumstances of that case, was not unconstitutional.

1. The plan proposed by intervenors sought to establish as many single-member districts as was feasible. There is no doubt that single-member districts, in certain instances, are preferable. *See,* Conner v. Johnson, 402 U.S. 690, 91 S.Ct.

1760, 29 L.Ed.2d 268 (per curiam, 1971). Additional factors taken into consideration were geography, ward and municipal boundaries, and rural and urban interests.

This Court notes additionally that the election is near and that to disrupt former ward lines would seriously hamper the Registrar of Voters in preparing for the election.

The ideal would be a plan which had no population variance at all, but inasmuch as no such plan has been presented,

IT IS THE ORDER OF THE COURT that the plan submitted by the St. Tammany Parish Police Jury be, and it is hereby, approved.