Edward P. DAMERON, III, Plaintiff,

v.

TANGIPAHOA PARISH POLICE JURY
and Luther Finch, its President,
et al., Defendants.

Civ. A. No. 69–1656.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Dec. 6, 1971.

Arthur W. Macy, Hammond, La., for plaintiff.

Joseph W. Simpson, Asst. Dist. Atty., Amite, La., for defendants.

ALVIN B. RUBIN, District Judge:

In this suit for reapportionment of the Tangipahoa Parish School Board,

the only remaining issue is whether any of the four plans submitted by the Board in successive efforts to maintain its present large number of members, without accepting one-representative districts, satisfies constitutional requirements. For it was long ago virtually conceded, and then decided, that the prior method of electing Board members violated the requirements of the Fourteenth Amendment. See Opinion of the court dated May 25, 1970, D.C., 315 F.Supp. 137, and Abate v. Mundt, 1971, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399; Hadley v. Junior College District, 1970, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45; Avery v. Midland County, 1968, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45; Swann v. Adams, 1967, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501; Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; Simon v. Landry, W.D.La.1968, 286 F.Supp. 60. Prior to that order the number of persons represented by each board member varied from 1415 persons in Ward 8 to 5565 persons in Ward 7.

■■■ The number of members of the School Board after reapportionment is set by the Board itself pursuant to State statute. Under this authority, the School Board, after reapportionment, may constitute from 5 to 15 members or "the number presently authorized for that school board, whichever is the greater." La.R.S. 17:71.2. The court has no authority to ordain a different number but only to require that the members be elected in a manner that assures each elector an equal voice. Equality of vote implies necessarily that voting districts must be so constituted as to give each elector an equal opportunity to elect a representative, and that their lines be drawn in such a manner as not to dilute minority group voting strength or erect artificial geographical barriers whose purpose is to frustrate true equality or achieve gerrymandered results.

■■ The goal of reapportionment is to approach "as nearly as is practicable" the ideal of perfecting equal representation. Reynolds, *supra*, 377 U.S. at 577, 84 S.Ct. at 1390 (1964). The criteria for evaluating reapportionment plans adopted by the Supreme Court neither require ideal mathematical equality nor approve a standard deviation. It is clear that there is no *de minimis* standard below which population variations would be considered insubstantial, Kirkpatrick v. Preisler, 1966, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519, and every deviation must be justified. But perfection is not demanded, for "mathematical exactness or precision is hardly a workable constitutional requirement." *Reynolds, supra*, 377 U.S. at 577, 84 S.Ct. at 1390. The same standards apply to local legislative bodies. Hadley v. Junior College District, (1970) 397 U.S. 50,[1] 90 S.Ct. 791, 25 L.Ed.2d 45.

■ Each reapportionment problem is unique, and local conditions must be recognized in devising a solution. Thus, the plan may seek "to preserve the integrity of political subdivisions," *Abate, supra*, 91 S.Ct. at 1907, to provide for "compact districts of contiguous territory," *Reynolds, supra*, 377 U.S. at 578, 84 S.Ct. at 1390, "to achieve some flexibility by creating multimember . . . districts," *Id.*, and to recognize "natural or historical boundary lines." *Id.* at 579, 84 S.Ct. 1362, 1390.

■ "[L]egislative reapportionment is primarily a matter for legislative consideration and determination, and . . . judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had

---

1. Because local legislative bodies frequently have fewer representatives than do their state and national counterparts and some local legislative districts may have a much smaller population than do congressional and state legislative districts, slightly greater percentage deviations may be tolerable for local government apportionment schemes, Abate v. Mundt, 1971, 403 U.S. 182, 91 S.Ct. 1904, 1907, 29 L.Ed.2d 399; cf. *Reynolds, supra*, 377 U.S. at 578, 84 S.Ct. at 1390.

920

an adequate opportunity to do so." *Reynolds, supra,* 377 U.S. at 586, 84 S. Ct. at 1394. Thus the task here is to decide whether any of the proposed plans is constitutionally adequate, not whether it is possible to design a more perfect plan by disregarding all factors other than mathematical exactness. "Ordinarily, a plan of reapportionment enacted by a local governing body . . . which meets the mathematical requirements of the one-man, one-vote formula, is presumed to be valid." Troxler v. St. John The Baptist Parish Police Jury, E.D.La.1971, 331 F.Supp. 222, 223. Those who challenge a plan have the burden of proving its unconstitutionality. Sewell v. St. Tammany Parish Police Jury, E.D.La.1971, 338 F.Supp. 252.

■ When the legislative body proposes a plan that is constitutional, then its inherent political desirability becomes a question to be resolved first by the local body, and then, if the voters disagree, by the action of the electorate at the polls.

■ The plan submitted that appears most nearly to meet constitutional requirements was adopted by the Board as an alternative to another plan considered the Board's first choice on July 27, 1971. It provides that the parish be reapportioned into four election districts and joins together geographically contiguous wards.

Furthermore, the population variance, when computed by the Supreme Court's method in *Abate,* is 5.5%. This is the lowest variance of any of the plans submitted by the School Board.

In this proposed plan, the 8 wards were incorporated into 4 geographical areas using the traditional ward lines as boundaries. Two of the districts consist of a single ward, a third district consists of two contiguous wards, and a fourth district consists of four contiguous wards. The School Board has waived its request for residency requirements in District B, so all three members there would be elected at large. But, in District A, the requirement that at least one member re-

side in each of the two wards would be retained in order to reduce the possibility that minority interests might be swallowed up by potential majority interests and to enhance equal protection. Whitcomb v. Chavis, 1971, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363. The adoption of this plan would cause a reduction of the number of representatives from Districts A, B, and C, and will potentially require incumbents to run against themselves; thus, there is no suggestion that this plan was designed to protect incumbents from being pitted against each other. This plan would reapportion the parish in the following manner:

| District | Wards | Population | Board Members |
|---|---|---|---|
| A | 1, 3 | 13,982 | 4 |
| B | 2, 4, 5, 8 | 9,941 | 3 |
| C | 6 | 10,377 | 3 |
| D | 7 | 31,575 | 9 |

This would require the election of nineteen school board members, the same number presently serving. In District A all candidates would run at large, but the proposal would require that there be at least one representative residing in each ward.

This plan must be assessed, not as if it were graven in stone, to be observed forever, but in view of the pragmatic requirement that, "viable local governments may need considerable flexibility in municipal arrangements if they are to meet changing societal needs," Abate v. Mundt, 1971, 403 U.S. 182, 91 S.Ct. 1904, 1907, 29 L.Ed.2d 399; Sailors v. Board of Education of Kent County, 1967, 387 U.S. 105, 110–111, 87 S.Ct. 1549, 1553, 18 L.Ed.2d 650. This July alternate plan appears to contain no "built-in" bias tending to favor particular geographic areas or political interests. There is no indication that it will tend to favor, for example, "less populous districts over their more highly populated neighbors," *Abate, supra,* 91 S.Ct. at 1907; see Hadley v. Junior College District, 1970, 397 U.S. 50, 57–58, 90 S.Ct. 791, 795–796, 25 L.Ed.2d 45. "It is true that the existence of any deviations from strict equal-

ity means that certain districts are advantaged at that point in time; but, under this plan, changing demographic patterns may shift electoral advantages from one town to another." *Ibid.*

For these reasons, the plan approved is as follows:

There shall be four voting districts which shall be comprised in the following manner:

District A—Wards 1 and 3
District B—Wards 2, 4, 5, and 8
District C—Ward 6
District D—Ward 7

The districts shall have the following number of representatives: A–4, B–3, C–3, D–9. All representatives from Districts B, C, and D shall run at large. In District A there shall be a residency requirement of at least one member from each ward.

Judgment will be prepared accordingly.