James H. STEWART et al., Plaintiffs,

v.

Mike O'CALLAGHAN et al., Defendants.

Gregory MILLSPAUGH et al., Plaintiffs,

v.

Michael O'CALLAGHAN, Governor of the State of Nevada, et al., Defendants.

Civ. A. Nos. R–2549, LV–1716.

United States District Court,
D. Nevada.

May 18, 1972.

---

Charles W. Deaner, J. Douglas Deaner, Las Vegas, Nev., for plaintiffs. Gregory Millspaugh, John Shipp, and Joe Neal.

Paul H. Lamboley, Reno, Nev., Renny I. R. Ashleman, Las Vegas, Nev., for plaintiffs, James H. Stewart, Donald Reese, Lani Pardini, Connie Saledino, James C. Shields, David F. Causey, Richard S. Pyes and Albert C. Johns.

Robert List, Atty. Gen., and Michael L. Melner, Deputy Atty. Gen., Carson City, Nev., for defendants, Mike O'Callaghan, Harry Reid, John Koontz, Mike Mirabelli and Wilson McGowan.

Clinton E. Wooster, and Perry Burnett, Deputy Legislative Counsel, Carson City, Nev., for legislator-defendants.

Before MERRILL, Circuit Judge, and EAST and McNICHOLS, District Judges.

PER CURIAM:

Plaintiffs, citizens, taxpayers and qualified electors of the State of Nevada, commenced this action to contest the constitutionality of an Act of the State of Nevada Legislature providing for the apportionment of the state legislature. The challenged legislation, Assembly Bill No. 825, Chapter 647 of the 1971 Statutes of the State of Nevada (herein Assembly Bill 825) was duly enacted by the 1971 Legislature of Nevada to reapportion the membership of the Nevada Legislature in accordance with the changes militated by population shifts evidenced in the 1970 United States Census, as reported by the Bureau of the Census. The plan for reapportionment so enacted provides for forty (40) single member assembly districts and twenty (20) single and multi-member senate districts; that is to say that the assembly is to be composed of forty members and the senate of twenty members.

Two suits were filed, which have been joined for trial and consideration as the issues and the relief sought are essentially identical. Defendants are the state and local elected officials charged with executing the election laws of the State of Nevada. Plaintiffs contend that Assembly Bill 825 violates the Constitutional guarantee of equal protection of the laws in that: (1) population disparities exist between the established legislative districts to a degree which offends the "one man—one vote" principle guaranteed by the Constitution, and, (2) that the multiseat senate districts established in the two populous counties are invidiously discriminatory and unconstitutionally deprive Nevada voters of equal representation. Other issues were raised in the respective complaints, but not pressed at trial. We therefore limit our consideration of the case to the two issues above delineated.

The 1970 United States Census of Nevada reports a total population of 488,738 persons. Utilizing this Census figure, the parties stipulate to the following mathematically determinable facts which we accept as established.

Ideally each of the forty members representing the assembly districts would represent 12,218 persons and each senatorial district would be made up of 24,436 persons. In actual practice, under the legislative district plan established by Assembly Bill 825, the assembly districts vary from a population of 13,958 in the most populous to 10,086 in the least populous and the senate districts vary from a high of 26,617 people to a low of 20,802. Converting these figures into percentages of variation, one finds that the most populous assembly district exceeds the mean approximately 14% (1740 people) while the least populous assembly district falls be-

low the mean approximately 17% (2,132 people). A one percentage point of variation representing approximately 125 persons. Among the senatorial districts the largest in people is approximately 9% above the mean (2,181 people) and that with the fewest people falls nearly 15% below (3,634 people); a one percentage point variation equalling about 240 persons.

These high and low peaks, conceded to exist, appear, in the abstract, to far exceed the constitutionally permissible variances previously countenanced in court tests under the so-called "one man—one vote" doctrine espoused by the United States Supreme Court under the teaching of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and the plethora of well known subsequent cases. However, a pragmatic overlook of the effect of the entire apportionment scheme adopted by the Nevada Legislature reveals that the statewide average disparity between assembly districts approximates 4% and, between senatorial districts, approximately 5%. Further, as we discuss more fully hereafter, a careful consideration of the entire representation picture discloses that the extremes of variation affect, at most, about 13% of the state population as a whole. If registered voter or eligible voter figures were used, this percentage of affected persons would shrink substantially.

We are therefore not disposed to condemn Assembly Bill 825 out of hand as being constitutionally infirm merely because of the rather considerable variance demonstrated affecting a relatively minor proportion of the population. We are affirmatively persuaded that an analysis of the entire structure of the plan and the underlying problems is required before the issues of this litigation can be meaningfully resolved. Other remedies, less radical than outright rejection of the challenged legislation, are available to us and should be explored.

The State of Nevada poses acutely unique and difficult problems, demo-graphically and geographically, to a legislature faced with the task of formulating a plan of legislative apportionment providing for population equality. In the excess of eighty percent (80%) of the people live in two counties, Clark (Las Vegas) and Washoe (Reno). The remainder of the population, something like ninety-five thousand people, are scattered throughout the balance of ninety-five thousand square miles of state area. The state has sixteen counties plus the state capital at Carson City which lies wholly outside of any county boundary. Ten of the counties have no incorporated community within the county lines. There are only seventeen incorporated communities in the entire vast state and seven of these are located in the two populous counties. Only the incorporated communities have local community governments. In the other rural counties, where no incorporated community exists, the Board of County Commissioners comprises the only form of local government.

Faced with the obvious difficulties inherent in a state politically and geographically structured as is Nevada, the legislature in its wisdom appears to have treated the reapportionment problem as a bifurcated one. An assembly of forty members and a senate of twenty members was agreed upon and thereafter separate consideration was given to the urban area vis á vis the rural portion of the state. Funds were appropriated and the use of a computer with computer-trained personnel was contracted for. It was necessary, in using the computer, to establish some basic unit of population measurement. The Census enumeration districts, established for the 1970 United States Census, were selected and became the so-called building blocks of the Nevada legislative plan. No one has suggested a better basic unit for this purpose. Indeed the plaintiffs, in attempting to suggest a better reapportionment scheme, utilized the census enumeration districts as the basis of calculations. The census enumeration districts as conceived for census purposes were prem-

ised on the establishment of districts each having approximately six hundred residents. In practice, in Nevada at least, it develops that these districts varied from nearly zero population to districts having upward of six thousand inhabitants. The staff expert for the Nevada Legislature testified that this variance created a built-in state-wide population disparity or divergence in the ultimately created legislative districts of as much as eight percent (8%). The percentage of built-in disparity is in dispute, but such a disparity in the order of five per cent (5%) is pretty well established and we accept this figure as proved.

Reapportionment of the urban areas in and adjacent to the cities of Las Vegas and Reno did not present insurmountable problems. Many census districts existed and the population areas were reasonably cohesive. The plan carried out by Assembly Bill 825 resulted in urban assembly districts totaling 32 out of the 40 districts in the state. Of these 32 urban assembly districts all resulted in a population total within five point six percent (5.6%) of the mathematical mean established for assembly districts, and three-fourths, or 24, are within three percent (3%) of the mean average (an exception exists in Assembly District No. 21 wherein a staff error resulted in added deviation and with which specific district we will deal hereafter). Of the twenty state-wide senate districts provided for, sixteen are located in the urban areas. The maximum divergence among the urban senate districts is seven percent (7%), with three-fourths, or 12 out of 16, having a population variation within three percent (3%) of the mean.

■ We have examined the population deviations which undoubtedly exist in the urban legislative districts. We have compared and considered the other proposed reapportionment plans—those which were before the Nevada Legislature and the plan suggested by some of the plaintiffs. We conclude that as to the urban districts the scheme encompassed in Assembly Bill 825 was arrived at in a good faith attempt by the legislature to apportion itself fairly and in accordance with Constitutional guidelines. We further conclude that as to the urban districts the legislature is apportioned as nearly as practicable in accordance with the "one man—one vote" principle and is not Constitutionally defective because of population deviations between the districts.

■ At this juncture we may as well consider the other issue raised by the plaintiffs as it deals with the urban senatorial districts. Plaintiffs alleged and sought to prove that the provisions of the Act setting up certain multiseat senatorial districts in Clark and Washoe Counties operate to dilute voting strength of the electorate and perpetuate incumbents in office. They contend that to this extent the Act is invidiously discriminatory and violative of the Constitutional right of equal representation. It is conceded, as well it must be, that multimember legislative districts are not inherently unconstitutional. The party mounting such an attack has the burden of proving that such districts do indeed unconstitutionally operate to dilute or cancel the voting strength of any segment of political grouping. Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). Plaintiffs' allegations in this regard are not substantiated by the evidence. The burden of proof has not been met. We have no hesitation in concluding that the multimember senatorial districts established by Assembly Bill 825 are not Constitutionally impermissible under the facts of this case.

At the close of all evidence defendants moved for dismissal on the multimember district issue. We took the motion under advisement. That motion is now granted.

It was in the apportionment of the rural area of the state that the Nevada Legislature encountered its most vexing problems, and where, likewise, we are faced with our greatest dilemma. As

indicated, the rural area is vast and the population sparse, being less than 100,000 and representing less than eighteen percent (18%) of the total population. The extreme high and low peaks of population divergence are found in this rural portion of the state. However, not all of the rural districts suffer from wide deviation from the mean average for the state. We propose to isolate the problem areas for closer consideration.

The rural assembly districts are only nine in number, encompassing 14 of the counties of the state as well as Carson City. Assembly Districts Nos. 34 and 35, which include six counties in their entirety have, respectively, three point six percent (3.6%) and three point nine percent (3.9%) population above the average of a theoretically ideal district. Assembly District No. 36, totally encompassing three other counties is shown to exceed the mean average by eight percent (8%).

The remaining rural assembly districts, in which the extremes of population variation are found, number five (Nos. 33, 37, 38, 39 and 40). Within these districts are found the five remaining counties plus Carson City. Approximately thirteen percent (13%) of the state population as disclosed by the 1970 Census reside in these five assembly districts. Elko County as an entity makes up Assembly District No. 33 and has a population of 13,958 persons, this being the most populous district in the state and its population exceeding the norm by fourteen percent (14%), thus Assembly District No. 33 stands alone as the peak population Assembly District. On the other hand, Assembly Districts Nos. 37, 38, 39 and 40 make up the low population Assembly Districts, being respectively fourteen percent (14%), fourteen percent (14%), seventeen percent (17%) and twelve percent (12%) below the ideal norm. Within these districts are the counties of Churchill, Lyon, Storey, Douglas and the state capital, Carson City.

The rural senate districts only number four, i. e., Nos. 17, 18, 19 and 20. District 18 is within six percent (6%) of the norm. District 17 is composed of Elko, Humboldt and Pershing Counties lying along the north boundary of the state and along the interstate highway. A transcontinental railroad and a major east-west river traverse these counties. Senate District No. 17 has a population of 26,617 persons and is nearly nine percent (9%) above the mean average and forms the high peak Senate District. Districts 19 and 20 are the low population districts, being each fourteen percent (14%) below the norm. These two districts encompass Churchill, Lyon and Storey Counties (No. 19) and Douglas County with Carson City (No. 20).

We have dwelt exhaustively on numbers and percentages in an endeavor to put the plan formulated as Assembly Bill 825 as the same worked out in actual practice into the clearest perspective.

The evidence before us leaves no room for doubt but that the Nevada Legislature approached the reapportionment task with three general guidelines in mind: (1) preservation of county boundaries, (2) protection of identifiable communities of interest, and (3) accomplishment of minimum numerical population disparities. Assembly Bill 825 does not divide any county, although Carson City is allocated into three separate assembly districts. Several counties necessarily were joined together in a number of instances in order to furnish sufficient population for single districts. Five of the nine rural assembly districts are made up of more than one county. All senate districts are multicounty. Communities of interest, where broadly definable, have generally been preserved intact. In accomplishing the first two objectives, i. e., preservation of county boundaries and preservation of communities of interest, population disparities resulted in some rural districts. These disparities, though affecting a relatively minor sector of population, nonetheless are more than minimal.

■ The evidence convinces us that county lines have great significance in Nevada. Distances are great and residents few. Major connecting highway facilities are at a minimum. Air transportation is practically nonexistent on a transstate basis, except as to the two principal communities. Two thirds of the rural counties have no local government except for that supplied by county commissioners. The only potential local political voice available to residents of a majority of the Nevada rural counties is through their county government. There then exists a county homogeny not found in smaller or more populated states. Substantial advantages to rural residents are gained in Nevada by maintaining the integrity of county lines within the reapportionment plan. It is clear that consideration of such factors may properly be given in reapportioning a state legislature and may be reason to support some numerical deviation from population based representation. Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 9 L.Ed.2d 399 (1971); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

The Nevada Legislature was likewise admittedly motivated by a desire to preserve the integrity of communities of interest in the rural areas. From the evidence it is established that the northern tier of rural counties border both a transcontinental highway and railroad and that both rail and highway follow a principal east-west flowing major river. The economy of this area is oriented to irrigated agriculture and stock raising as well as an important tourist business. The easterly and mid-section area of the state has a mining and dry livestock grazing economy. The rich central-western area of Nevada is intensively in agriculture. Under the provisions of Assembly Bill 825, these areas are grouped, as nearly as practicable, into legislative districts. Distinct and important advantages are enjoyed by the Nevada elector through this grouping.

■ We turn our attention then to those legislative districts wherein we feel the disparity in population is most critical. From the factual background we have attempted to depict emerge a number of districts, both assembly and senate, which seem to present an inordinate degree of variation from the ideal average district.

Among the assembly districts, District 33, made up exclusively of Elko County, has a population fourteen percent (14%) greater than the mean. Assembly Districts 37, 38, 39 and 40 are from twelve percent (12%) to seventeen percent (17%) underpopulated.

Senate Districts Nos. 19 and 20 are likewise underpopulated in the excess of fourteen percent (14%).

Defendants seek to justify these high and low population districts. As to District No. 33, Elko County, the need for both county line respect and community of interest preservation are held to be emphasized in importance. Persuasive evidence was offered tending to show that any logical division of the county would, in one way or another, work a hardship on the residents of the severed area. The electors cut off from the county would be either joined with an area of differing community of interest or one geographically isolated from the residential area of the district to which newly-attached because of lack of direct access by highway. We find this testimony very moving and quite convincing. However, we are also persuaded that the divergent and consequent dilution of voting power is excessive and falls afoul of the "one man—one vote" principle. We are satisfied that corrective measures must be taken and will speak to the issue of a solution later herein.

■ Assembly Districts 37, 38, 39 and 40 and Senate Districts 19 and 20, all underpopulated, on an average of at least fourteen percent (14%), can be for our purposes, considered together. These districts are in the general area of Carson City and Lake Tahoe (Douglas County). This, defendants point out, is the fastest growing section of the state. It is evident that the Nevada

Legislators entertained some feeling that very soon the population of the assembly and senate districts located here would swell to a point where the districts would attain or surpass the population of an ideally average district. The Carson City area itself had increased two hundred percent (200%) in population between the years 1960 and 1970. The Lake Tahoe region likewise had enjoyed a similar growth pattern. An expert witness opined that by the date of the trial of this matter in 1972, the Carson City—Douglas County area had already attained a population increase sufficient to wash out the present disparity below the mean. We find ourselves unable to fully accept this type of speculation as a basis on which to rest reapportionment, though we recognize that reasonable legislators might well, in good faith, be impressed by the apparent validity of the prognosis of probable growth. The legislature struggled to achieve more even representation in this portion of the state. They divided the Carson City environs and allotted portions to three separate assembly districts in conjunction with adjacent counties.

The evidence indicates that the reapportionment problem was among the last important matters taken up by the 1971 legislature and that imminent adjournment of a record-breaking, overlong legislative session influenced the acceptance of a less than satisfactory solution. As a result of this faulty reliance on prospective growth factors coupled with the press of shortage of time, the assembly and senate districts in this area have a disparity which is too great to be Constitutionally countenanced.

In summary: the reapportionment plan for apportioning the Nevada State Legislature as formulated by Assembly Bill 825 fails to attain perfection. However, except for Assembly Districts Nos. 33, 37, 38, 39 and 40 and Senate Districts Nos. 19 and 20, the deviation in population is within tolerable limits considering the unique problems presented in the State of Nevada.

■ The requirement that a state legislature be apportioned on a population basis has never been held to mean that exact mathematical equality must be met. It is sufficient if, under the facts peculiar to the state, an honest and good faith attempt has been made to reach as near an equal population representation as is practicable. Reynolds v. Sims, *supra*.

We hold that, with the exceptions noted, the Nevada plan meets these standards.

The obligation of the Court, having made the foregoing determinations, is to fashion some remedy which will, under the conditions existent, best serve the ends of justice and protect the elective process in Nevada.

We are most cognizant of the rapidly approaching deadline for legislative candidates to file for election. Less than a month remains before such filings begin. A primary election must follow on the heels of candidacy filings and the 1972 general election is imminent. Note is taken of the fact that the Nevada Legislature is not in session and will not regularly meet before the early months of 1973. Under controlling Nevada law, election machinery is already well underway. Any serious disruption of the election process at this late date can only create a chaotic condition.

We are therefore disposed to hold, and do hold and order, that the 1972 election of the membership of the Nevada Legislature may proceed as provided in Assembly Bill 825, with the correction hereby ordered affecting Assembly Districts Nos. 21 and 22.

It is ordered that the reapportionment plan established by Assembly Bill 825 be, and the same hereby is, corrected, as intended by the legislature, to provide for the transfer of Census Enumeration District No. 318–B from Assembly District No. 21 to Assembly District No. 22 and that the votes of the electors residing in said Census Enumeration District No. 318–B be counted and enumerated with the votes of other electors in As-

sembly District No. 22 as established by Assembly Bill 825 in the primary and general elections of 1972.

It is further ordered that we retain jurisdiction of these cases until at least thirty days after the adjournment of the first regular session of the Nevada State Legislature for the year 1973.

It is further ordered that the Nevada State Legislature, in its first regular session of the year 1973, take appropriate steps to correct population deviations existing in the apportionment of representation in the Nevada Legislature.

It is further ordered that within thirty days following the adjournment of the first regular session of the Nevada State Legislature in the year 1973 any party to this action may file such pleadings as he may think appropriate to seek further consideration of this cause by the Court. If no such filing be made within the time limit stated, the instant cases will be subject to final dismissal.

It is ordered that this opinion shall constitute the Court's Findings of Fact and Conclusions of Law as authorized by Rule 52(a) of the Federal Rules of Civil Procedure.

It is so ordered.