QUESTIONS: 1. Is redistricting of county commission districts mandatory upon receipt of the 1970 decennial census by the Board of County Commissioners of Brevard County? 2. Is the current division of county commission districts of Brevard County "as nearly equal in population as practicable" as required under Art. VIII, s. 1(e), State Const.?
SUMMARY: Redistricting of county commission districts is mandatory as soon as possible upon receipt of the decennial census by the Board of County Commissioners of Brevard County. If county commissioners decide after a de novo inquiry that the current county commissioners' districts are as nearly equal as practicable and no change is otherwise necessary after a consideration of all guidelines, state and federal, such a districting plan must be formally approved by the commission and the minutes of the meeting forwarded to the secretary of state in accordance with s. 124.03, F.S. An unqualified approval cannot be given to any county commission districting plan. Whether districts are as nearly equal as practicable is a subjective matter to be considered upon each county's individual circumstances. A purely numerical review of the composition of Brevard's districts appears satisfactory. However, each county is different, and other statutory and constitutional requirements must be considered. Article VIII, s. 1(e), State Const., provides: (e) Commissioners. Except when otherwise provided by county charter, the governing body of each county shall be a board of county commissioners composed of five members serving staggered terms of four years. After each decennial census the board of county commissioners shall divide the county into districts of contiguous territory as nearly equal in population as practicable. One commissioner residing in each district shall be elected by the electors of the county. (Emphasis supplied.) Section 124.03, F.S., requires that each county file with the Department of State a certified copy of the changes in the boundaries of the districts of county commissioners by providing as follows: 124.03 Description of district boundaries to be furnished department of state. — Whenever the boundaries of existing county commissioners' districts are, from time to time, changed by the board, it shall cause its clerk to forthwith furnish the department of state with a certified copy of its minutes, reflecting the description of the boundaries of the district, as changed, which shall record a description of such boundaries in its office in a book kept for that purpose.
The above statute and constitutional provision impose a mandatory duty upon the county commissioners to redistrict after each decennial census. See AGO's 070-53 and 072-17. The commentary on this portion of the revised Constitution by Talbot "Sandy" D'Alemberte emphasizes the change from the 1885 Constitution as it relates to your question: The requirement that the county commissioners "shall divide" the county into contiguous districts as equal in population as practicable following each decennial census is in sharp contrast to the recommendations of Article VIII, Section 5 of the 1885 Constitution that the county commissioners shall from "time to time" fix the boundaries of the districts. The county commissioners have no option but to create new districts according to population. See AGO 047-162, Biennial Report of the Attorney General, 1947-1948, page 616, relying upon Prince v. State ex rel. Williams, 25 So.2d 5 (Fla. 1946). However, it may be the decision of the commissioners, after thorough inquiry, that there is no need for change from the current plan. If the county commissioners find that the districts as presently constituted are already as nearly equal in population as practicable and assuming all relevant tests as outlined hereinafter are met, and such is the decision of the county commissioners, it is within the bounds of their discretion to perpetuate the present territorial consistency of each district. In this event, the plan must be reenacted. Simply taking no action, in my opinion, will not suffice. It should be noted that s. 124.02, F.S., provides for publication of notice: 124.02
Notice of change of boundaries of district to be given by publication. — (1) Whenever the boundaries of existing county commissioners' districts are, from time to time, changed by the board of county commissioners, it shall cause an accurate description of the boundaries of such districts, as changed, to be entered upon its minutes and a certified copy thereof to be published once each week for four consecutive weeks (four publications being sufficient) in a newspaper published in said county. (2) If there be no newspaper published in such county, then three copies of said minutes shall be posted for four consecutive weeks in three different and conspicuous places in such county, one of which shall be at the front door of the courthouse. (3) Proof of such publication or posting shall be entered on the minutes of the board. The publication or posting of such copy shall be for information only and shall not be jurisdictional. Implied therein is a duty to publish a description of the present districts, even if it is decided no change in their present territorial boundaries is necessary. It is then incumbent upon the commissioners to take affirmative action and inquire de novo into whether the districts of the county are as nearly equal as is practicable, and, thereafter, if such is their decision, to report to the secretary of state. Your first question is answered affirmatively. Your second question involves a matter within the reasonable and nondelegable discretion of the county commissioners. The first responsibility for applying the yardstick or measuring rod controlling the exercise of this discretion is committed to the county commissioners by the Florida Constitution. Article VIII, s. 1(e). The question of whether Brevard County is divided into districts as nearly equal in population as practicable involves a mixed question of fact and law. Every county is different. That which is practicable in one county is not practicable in another. The census data, voter registration data, shifts in population, geographic peculiarities, and practicalities of the local situation will differ from county to county. For example, census data, which should whenever possible comprise the fundamental tool for redistricting may be presented in a much more usable form in one county than another. Where a great number of county census districts or bloc units have been established and made generally available by the United States Census Bureau, a county will have a far easier redistricting task than will another county which was only divided into a very few census districts. In fact, some counties may have been enumerated by the Bureau of Census in such a manner that the county is divided into only three, four, or five units. In such a situation, the few units may in no mathematical combination approach equality when the commissioners attempt to allot those units into five equal districts. Such a hypothetical county would have to resort to other data and sources of information, to be used in addition to and in combination with the decennial census. Several counties, indeed, have had to supplement their official decennial census data for just such reasons as set out in my hypothetical. Such supplemental information may be utilized so long as the county commissioners are careful to be completely consistent in the use of it. For example, it would not be acceptable to use a house-by-house count conducted a year after the decennial census as "the count" for one area of the county, voter registration figures in another area, and the enumeration as provided by the United States Census Bureau as the count in the remaining areas. See AGO 057-303. "Guess work" is not a reasonable exercise of the discretion vested in the county commissioners. Singletary v. State ex rel. Kauffman, 69 So.2d 794 (Fla. 1954). Districts in one county may be possible which are apportioned with greater mathematical exactness than those possible in another county because of the practicality of information available. However, reasonable steps must be taken to secure enough reliable data so that redistricting can be done in compliance with the Florida Constitution. Obviously, the county commissioners may not simply do nothing because the United States Census Bureau has not provided sufficient data and may not rely on pure guess work. Singletary v. State ex rel. Kauffman, supra. The question then occurs, what is the meaning of the term "as nearly equal in population as practicable," Art. VIII, s. 1(e), supra, or "as nearly equal in proportion to population as possible," s.124.01(1), F.S.? What does this mean in plain English? In fact, you ask, has Brevard County complied with these terms and any law otherwise applicable. I cannot give an unqualified final adjudication of compliance to the Brevard County commissioners such as would immunize them from suit. In my opinion, it would be inappropriate to do so. It has been said courts are without power to set out maximum or minimum limits of variances which may be tolerated. Singletary v. State, 69 So.2d 794 (Fla. 1954). Certainly, the attorney general does not have the power to award such a final judgment of compliance. It is my opinion, however, based on the cases cited herein and from the mathematical information provided, that no further inquiry by my office is warranted at this time. Please understand, however, that an unqualified approval of Brevard's redistricting plan is, firstly, premature until the commissioners have acted pursuant to my opinion as stated in answering your first question. Secondly, such a final adjudication may involve more than a comparison of numbers, as I will indicate. I only note that no proceeding against the Brevard plan is indicated by the information you have provided. Brevard's population of 230,006 is now apportioned as follows: County Commission District No. 1:41,965 County Commission District No. 2:51,119 County Commission District No. 3:40,647 County Commission District No. 4:42,207 County Commission District No. 5:54,068 The tolerable limits of state decisions such as Ryan v. State, 60 So.2d 188 (1952) and Prince v. State, supra, which were decided upon similar provisions of statutes and constitutions are not necessarily helpful. Recent United States Supreme Court decisions would appear to condone county plans which deviate from the average district as much as those you outline. See Mahan v. Howell, 410 U.S. 315 (1973); Abate v. Mundt, 403 U.S. 182 (1971); Avery v. Midland County, Texas,390 U.S. 474 (1968). The difference between Florida's constitutional requirement that districts be created "as nearly equal in population as practicable" and its statutory requirement that districts be "as nearly equal in proportion to population as is possible" is not significant. Article VIII, s. 1(e), of the 1968 Florida Constitution is derived from Art. VIII, s. 5, of the 1885 Florida Constitution; and s. 124. 01(1), F.S., is in substance a rephrasing of the first sentence of Art. VIII, s. 5 of the 1885 Constitution. See Prince v. State, 25 So.2d 5 (Fla. 1946), at p. 9. The two phrases are, for instant purposes, synonymous, and the cases construing the language of Art. VIII, s. 5, are equally applicable to Art. VIII, s. 1(e). In Ryan v. State, 60 So.2d 188
(Fla. 1952), there were five county commissioners' districts ranging in population from 12,686 to 19,259. The total population of the county involved was 72,229 with the average ideal population per district being 14, 846. The Florida Supreme Court upheld the variance in population of the five districts with this discussion:[2] Our examination of the map of the five districts shows that the West side of the County is embraced in District 1, which is primarily agricultural and that Districts 2, 3, 4 and 5 embrace the East side of the County, the dominant interest of which is tourists. It was also shown that the East side or coastal area had a much larger population and that its population was increasing much more rapidly. These considerations no doubt influenced the County Commissioners largely in their division of the county into County Commissioners Districts. In doing this, however, Districts two, three, four and five do not reveal a material variance from the constitutional requirement, but District one on its face shows considerable variance. This is accounted for by the fact of much more rapid growth on the East side of the County than on the West side. It is also accounted for in the similarity of interests dominant on the East side and their difference from those on the West side. We think the County Commissioners may place some emphasis on these and other practical considerations, provided they do not lead to a result too far at variance from the constitutional requirement. The dominant purpose of Section 5, Article VIII, is equality of representation as near as can be attained within a reasonable range of discretion. It is not required that the Districts must be equal in population. After consideration of the elements shown to have been brought into play in this case, we cannot say that the County Commissioners abused their discretion. There was approximate equality of representation in four of the districts and, while there is variance as to the other, some good reasons are shown for it. 60 So.2d at 189-190. [Emphasis supplied.] The Ryan court thus alluded favorably to several "practical considerations" other than population which were properly taken into account so long as they did not lead to a result too far at variance from the constitutional requirement. A rapidly growing population and similarity of interests in agriculture, in one district, and tourism in another, were two such considerations. In Prince v. State, 25 So.2d 5 (Fla. 1946), the Florida Supreme Court did find an abuse of discretion by a board of county commissioners where the districts created ranged in population from ten thousand to forty thousand. Such gross inequality would certainly not be countenanced today. The court explained the commissioners' discretion this way:[5] It is contended in this case that the County Commissioners may exercise wide discretion when dividing a county into County Commissioners' districts. It is true that such Boards may exercise a reasonable discretion but that discretion must be exercised within the terms of the Constitution and the Board cannot disregard the mandate of the Constitution requiring that such districts must be created with a view to equality in population. This does not mean that the Board is bound to so create the districts that each will have an identical population. But it does mean that the population of each district shall be equal to that of the others as near as it is practicable to attain that end. [See] 25 So.2d at 9. As these two cases point out, county commissioners may exercise a reasonable discretion when dividing a county into county commissioners' districts, but that discretion must be exercised within the constitutional limitation that the districts be "as nearly equal in population as practicable." Article VIII, s. 1(e), State Const. The districts do not have to be exactly equal in population and the commissioners may look to practical considerations "provided they do not lead to a result too far at variance from the Constitutional requirement." Courts are without the power to set out the maximum and minimum limits of such variance. Singletary v. State, 69 So.2d 794 (Fla. 1954). Likewise, the attorney general's office does not have such power. When any redistricting is done, federal constitutional law should be kept in mind. A state legislative apportionment plan is to be judged by the equal protection test enunciated in Reynolds v. Sims, 377 U.S. 533
(1964), that test being that districts in state reapportionments must be "as nearly of equal population as is practicable." While this language is very similar to that of the Florida Constitution and therefore helpful by analogy, it is important to remember it is the state constitution which requires each district to be composed of population as nearly equal to the other as possible. Federal one person, one vote questions seem to be resolved by the fact that all Brevard's commissioners are elected at-large by all the county electorate and are answerable to all the county's people. In a sense, the county is a large multimember district, and the five subdistricts are residency districts. Because all commissioners are elected at-large, and because they must run at-large and serve all citizens and voters equally, equal protection problems are minimized. Dusch v. Davis, 387 U.S. 112
(1967); Fortson v. Dorsey, 379 U.S. 433 (1964). I.e., from a purely mathematical point of view, each commissioner is voted upon by exactly the same number of people. That commissioner represents everyone in the county, not just the people in the district from which he is elected. From the citizen's vantage point, each person has just as many commissioners to represent him, to wit, five, as every other person in the county. Federal courts, however, view each case on its own facts and warn against reliance on similar cases. Swann v. Adams, supra. My conclusions here are colored by a similar caveat. Assuming that the districts are determined to be as nearly equal as practicable, the commissioners' task is still not complete. The districts must not be drawn so as to invidiously discriminate against any identifiable group or so as to otherwise violate our constitutions, state or federal. Additionally, all districts must be composed of contiguous territory. Article VIII, s. 1(e), State Const. See People v. Simpson, 139 N.E. 890 (Ill. 1923); and People v. Dodds, 142 N.E. 241 (Ill. 1923); as to the meaning of contiguity. Under federal cases, the United States Supreme Court has said so long as the divergencies from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible . . . . Reynolds, at 579. [Emphasis supplied.] More recent United States Supreme Court interpretations of the "one person, one vote" test include Mahan v. Howell,410 U.S. 315 (1973); White v. Regester, 412 U.S. 755 (1973); Gaffney v. Cummings, 412 U.S. 735 (1973); and White v. Weiser,412 U.S. 783 (1973). A recent United States Court of Appeals decision in our circuit, along with aforementioned, emphasizes the need for a case-by-case approach. In Zimmer, the court said, inherent in the concept of fair representation are two propositions: first, that in apportionment schemes, one man's vote should equal another man's vote as nearly as practicable; and second, that assuming substantial equality, the scheme must not operate to minimize or cancel out the voting strength of racial elements of the voting population. Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973). In White v. Regester, supra, a multimember district (although not per se unconstitutional) was held unconstitutional since it was being used to cancel out or minimize the voting strength of racial groups. Multimember districts may also be vulnerable if they minimize the voting strength of political groups. Gaffney v. Cummings, supra. See also Whitcomb v. Chavis, 403 U.S. 124 (1971). Zimmer v. McKeithen, supra, extended the holdings and reasoning of the above cases to local governing units and held that the apportionment plan there considered did dilute the black vote in the parish and was therefore unconstitutional. That case involved elections of officers to a school governing board. Each officer was voted upon by the entire parish. However, one officer was required to be a resident of each subdistrict. That situation is analogous to the at-large election of Brevard County commissioners who reside in one of five districts which, by Florida law, must be composed of equal numbers of people, as nearly as practicable. The point of Zimmer, applicable here, is that although population must be the major consideration in reapportionment of county commission districts, these districts cannot be set up so as to dilute minority or political group voting strength. On the other hand, so long as equality in population among districts is not disregarded, certain considerations other than population are permissible. While it would be impossible to chronicle all valid considerations, and inappropriate to speculate on what courts might do in reviewing a particular redistricting plan, efforts to avoid fragmenting political subdivisions, recently, in the cases of the United States Supreme Court, under proper historic considerations, justified minor deviations from absolute equality. Mahan v. Howell, 410 U.S. 315 (1973). As in many areas of the law where an exercise of discretion is involved, there are no firm guidelines for county commissioners to follow in exercising their discretion. However, the cases cited above and the analysis thereof should be of assistance. Your second question is answered in the affirmative subject to the above comments and qualifications.