Stewart F. Hancock, Jr., J.
At the argument of plaintiffs’ motion for summary judgment on May 11, 1973, it was stipulated by all parties that the present districting of the County Legislature of Onondaga County was in violation of the New York State and Federal Constitutions and that redistricting was mandated under State and Federal court decisions. Accordingly, the County Legislature was directed to prepare and approve for submission to the court for its consideration a recommended plan for districting. Subsequently, it was ordered that the County Legislature’s plan and any districting maps or proposals being submitted by any of the other parties would be received on or before June 16, 1973. On June 16, 1973 only two plans were submitted, the county plan approved by the Onondaga County Legislature by Resolution No. 293 on June 15,1973 and a plan submitted by plaintiff-intervenor, the Village of North Syracuse.
The three individual plaintiffs — Ronald Stott, Allen Miller and David Patrie — have submitted no proposed districting maps. They contend, however, in a brief submitted by their attorneys, that the proposed county plan is unconstitutional and urge its rejection by the court and the adoption of a weighted voting scheme, using the present legislative districts, as a temporary measure for the 1973 elections. The Leagues of Women Voters of the Syracuse Metropolitan area and of Payetteville and Manlius, amici curiae, have submitted no counterproposals or suggested amendments to the county plan and have voiced no opposition to any aspect of it. They request in their brief, however, that the court “impose the proposed reapportionment [presumably the county plan] plan on an interim basis and require a referendum as to its permanency ’ ’ in the 1973 general election.
The proposed county plan, prior to its adoption by the Legislature on June 15, 1973 and after the maps showing the proposed districting were made public, was the subject of a well-publicized formal public hearing held by the Reapportionment Commission of the County of Onondaga on May 22, 1973, at which approximately 30 persons were in attendance.
The county plan had beep, prepared prior to the May 22, 1973 public hearing by the Reapportionment Commission (appointed by Resolution No. 282 adopted on June 7, 1971 by the Onondaga County Legislature) after a series of nine meetings held between March 30, 1973 and May 18, 1973.
The Reapportionment Commission meetings were open to the public and were well attended by representatives of various *844 interested groups including, on occasions, plaintiffs. After the May 22, 1973 public hearing, additional meetings of the Beapportionment Commission were held on May 23, June 11 and June 12, 1973. As a result of the hearing and the subsequent Beapportionment Commission meetings various minor alterations were made in the maps as originally presented at the May 22, 1973 public hearing.
At the final Beapportionment Commission meeting held on June 12,1973, the commission’s plan and the maps, as amended, were unanimously approved for submission to the Onondaga County Legislature. It should be noted that the Beapportionment Commission consisted of five members, including the Onondaga County Commissioner of Elections of the Democrat Party and a Democrat member of the Onondaga County Legislature.
The entire process leading to the formulation and adoption of the county plan has been the. subject of widespread public interest and has consistently received broad newspaper and television coverage due in part, no doubt, to the defeat, at referendum, of the county’s prior redistricting plan (also formulated by the Beapportionment Commission) by the narrow margin of 463 votes on March 30, 1973.
THE PLAN APPROVED BY THE COUNTY LEGISLATURE
The current county plan now submitted for court approval contains 24 legislative districts, the same number as the present legislative plan. Fourteen of the proposed districts are wholly in the towns and outside of the City of Syracuse. Eight are entirely within the city, while two districts are partially in the city and adjoining towns.
The districts outside the city must be created from the county’s 19 towns having populations ranging from Salina with 38,281 and Clay, 36,274, to Spafford with 1,148 and Otisco, 1,470. The mean district population of the 24-district plan is 19,701. Thus, to achieve anything approaching “ one man-one vote” representation, some towns must necessarily be combined, some divided, and town lines must be intersected. Of the county’s smaller towns, 10 — i.e., Lysander, Spafford, Otisco, Marcellus, Skaneateles, Onondaga, Fabius, Pompey, Tully and Elbridge — are included entirely as part of legislative districts with their lines left intact and not intersected, while two — Van Burén and Lafayette — have been divided. The other districts are composed of combinations of parts of the larger towns (i.e., Clay, Cicero, De Witt, Salina, Camillus,
*845 Geddes, Manlius). Thus, 10 of the 19 towns remain intact. In cases where districts have been created by combining one or more whole towns with portions of one or more adjacent towns (Districts Nos. 1, 6,11, 12 and 13) the district boundaries coincide, for the most part, with town boundaries. In Districts Nos. 7, 8 and 9, where single districts have been created out of parts of large towns (i.e., De Witt, Oamillus, and Geddes) town lines constitute a substantial portion of the district boundaries ; and even in districts composed of combinations of parts of large towns (Nos. 4, 5,10 and 14) and of parts of large towns with adjoining city territory (Nos. 19 and 24) town lines and the district boundaries coincide in numerous places.
The largest district (No. 24, consisting of part of Syracuse and part of Salina) has a population of 20,482 or 3.96% over the mean district population of 19,701. The population of the smallest district (No. 2, consisting of Lysander and part of Van Burén) is 18,705 or 5.06% under the mean. Thus, the total deviation from the mean population between the largest and smallest districts is 9.02%. Stated another way, the population variation ratio between the largest and smallest districts is 1.095 to 1. The average percentage variation of the districts, either above or below the mean population, is 2.67%.
It should also be noted that the proposed county plan contains one district, the 23d, which has a nonwhite population of 52.3%. In including a district fairly designed to permit the election of a representative of Syracuse’s nonwhite population as a member of the County Legislature, the present plan is a substantial improvement over the defeated county plan which contained no such district. As a result, opposition for failure to provide minority group representation has, apparently, been eliminated. Neither plaintiffs nor amici have suggested that the county plan is objectionable on this score.
Furthermore, the greater number of districts in the proposed plan (24 as compared' to 22 in the defeated county plan) and the reduced number of districts combining parts of towns with adjacent city territory (two in the present plan as contrasted .with four in the defeated plan) have apparently obviated objections from other groups who opposed the prior plan.
THE NORTH SYRACUSE PLAN
The plan submitted and urged upon the court by the Village of North Syracuse is in all respects identical with the county pían except for the boundaries of Legislative Districts No. 3 and No. 14 which are altered to include the whole of the Village *846 of North Syracuse within District No. 14 and the Brewerton area in District No. 3.
The Village of North Syracuse, it must be remembered, lies in two towns — day and Cicero. Under the county plan for the North Syracuse area the town boundary lines are adhered to — thus placing that portion of North Syracuse which lies in the Town of Clay in District No. 14 and the Cicero portion of the village in District No. 3.. The North Syracuse Plan contains an irregular indentation to the east from the town boundary line for the purpose of including the Cicero part of the village in District No. 14. To compensate for this additional population in District No. 14 and the resultant population loss in District No. 3, the Brewerton community is shifted from District No. 14 to District No. 3.
The populations in the proposed Districts No. 3 and No. 14 in the North Syracuse plan are 20,001 and 19,252, respectively. The deviations for Districts No. 3 and No. 14 from the mean population of 19,701 are greater in the proposed North Syracuse Plan than in the county plan, although both are less than the average deviation of 2.67%. In the North Syracuse Plan the deviation for District No. 3 is plus 1.157 % and for No. 14 minus 2.28%. The corresponding county plan deviation for District No. 3 is minus .37% and for District No. 14 minus .34%.
THE OBJECTION OF PLAINTIFFS STOTT, MUJER. AND PATRIE THAT THE PLAN EXCEEDS THE PERMISSIBLE POPULATION DEVIATION AND IS, THEREFORE, UNCONSTITUTIONAL.
It should be emphasized that the plaintiff-intervenor, the Village of North Syracuse, except for its recommended changes regarding North Syracuse and Brewerton, contends that the proposed county plan is valid and urges the court to adopt it. This position is consistent with the resolution of the North Syracuse Village Board adopted June 14, 1973 authorizing the village’s intervention in the action and the retainer of separate attorneys, Bond, Schoeneck & King, to represent its interests.
Ronald Stott, one of the original plaintiffs, represented by Oot, Greene, Setright, Hershdorfer & Sharpe, is the Mayor of North Syracuse. During the various meetings and discussions with counsel prior to June 16, 1973, the court was advised that plaintiff Stott favored adoption of the proposed county plan except for the division of the Village of North Syracuse — the same position he had advocated before the Reapportionment Commission and now being urged by the village as plaintiffintervenor. The inconsistency of Mayor Stott’s present pdsi *847 tian, as one of the original plaintiffs, in objecting now to the. constitutionality and validity of the over-all county proposal, thus, seems apparent.
As stated, the Leagues of Women Voters represented by separate counsel, as amici, have raised no objection to the county plan.
Plaintiffs do not claim that the proposed districts are not of convenient and contiguous territory or that they are not in as compact a form as practical. (See Municipal Home Buie Law,
§ 10, subd. 1, par. a, subpar. [13], cl. [a], subcl. [iv]; see, also, N. Y. Const., art. III, § 4.) Bather, their sole objection is that the 9.02% variation between the largest and smallest districts is constitutionally impermissible. This contention is clearly negated by the holdings of the Supreme Court in Abate v. Mundt (403 U. S. 182 [1971]), and its most recent decisions on the subject — White v. Regester (412 U. S. 755) and Gaffney v. Cummings (412 U. S. 735). In Abate v. Mundt (supra), the Supreme Court approved a total deviation in a reapportionment plan for Bockland County in New York between the largest and smallest districts of 11.9%. The New York Court of Appeals in its opinion upholding the Bockland County plan (Abate v. Mundt, 25 N Y 2d 309, 315) stressed the broader deviations permitted when dealing with local legislative bodies such as the Bockland County Legislature. The court stated: “We must, therefore, in light of the particular circumstances of this case, determine whether the county has made a good faith effort to achieve equality of representation and whether there is sufficient justification for any variance from absolute equality. On this point, it should be recognized that the ‘ one man-one vote ’ cases have involved at least three levels of legislative reapportionment and that, in dealing with each of these levels, there are quite properly taken into account and weighed in the balance different considerations both as to the permissible variations from strict equality and as to the justification for variations from such strict equality. The United States Supreme Court decisions indicate that, in regard to apportionment of congressional districts, the permissible variation from strict equality is indeed almost micrometric and the justification required for such deviation is correspondingly stringent (see Wesberry v. Sanders, 376 U. S. 1; Kirkpatrick v. Preisler, 394 U. S. 526; Wells v. Rockefeller, 394 U. S. 542). Decisions dealing with apportionment of State Legislatures tend to reflect a broader scope for permissible deviations and a more *848 tolerant attitude toward the practical justification for deviations (see Fortson v. Dorsey, 379 U. S. 433, 437; Burns v. Richardson, 384 U. S. 73; Swann v. Adams, 385 U. S. 440). Similarly, and of particular relevance on this appeal, the court has indicated a willingness to allow a still broader scope for permissible deviations from strict population equality and the justification for such deviations when dealing with local, intrastate legislative bodies (see Sailors v. Board of Educ., 387 U. S. 105; Dusch v. Davis, 387 U. S. 112; Blaikie v. Wagner, 258 F. Supp. 364).” (Emphasis supplied.)
In White v. Regester (supra) the United States Supreme Court held that the single fact of a total deviation in the Texas State legislative reapportionment plan of 9.9% did not make out a prima facie case of equal protection violation, under the Fourteenth Amendment such as to require justification on State policy grounds. In reversing the District Court and reaffirming and explaining its prior holding in Abate v. Mundt (403 U. S. 182, supra), the court (White v. Regester, 412 U. S. 761-764, supra [per White, J.]) had this to say: “ The District Court read our prior cases to require any deviations from equal population among districts to be justified by ‘ acceptable reasons ’ grounded in state policy; relied on Kirkpatrick, v. Preisler, 394 U. S. 526 (1969), to conclude that the permissible tolerances suggested by Reynolds v. Sims, 377 U. S. 533 (1964), had been substantially eroded; suggested that Abate v. Mundt, 403 U. S. 182 (1971), in accepting total deviations of 11.9% in a county reapportionment was sui generis; and considered the ‘ critical issue ’ before it to be whether ‘ the State [has] justified any and all variances, however small, on a basis of a consistent, rational State policy, ’ 343 F. Supp., at 713. Noting the single fact that the total deviation from the ideal between District 3 and District 85 was 9.9%, the District Court concluded that justification by appellant was called for and could discover no acceptable state policy to support the deviations.” And further: “ Insofar as the District Court’s judgment rested on the conclusion that the' population differential of 9.9% from the ideal district between District 3 and District 85 made out a prima facie equal protection violation under the Fourteenth Amendment, absent special justification, the court was in error. It is plain from Mahan v. Howell, 410 U. S. 315 (1973), and Gaffney v. Cummings, [412 U. S. 735], that state reapportionment statutes are not subject to the same strict standards applicable to reapportionment of congressional seats. Kirkpatrick v. Preisler did not dilute the *849 tolerance contemplated by Reynolds v. Sims with respect to state districting, and we did not hold in Swann v. Adams, 385 U. S. 440 (1967), or Kilgarlin v. Hill, 386 U. S. 120 (1967), nor later in Mahan v. Howell, supra, that any deviations from absolute equality, however small, must be justified to the satisfaction of the judiciary to avoid invalidation under the Equal Protection Clause. For the reasons set out in Gaffney v. Cummings, supra, we do not consider relatively minor population deviations among state legislative districts to substantially dilute the weight of individual votes in the larger districts so as to deprive individuals in these districts of fair and effective representation. Those reasons are as applicable to Texas as they are to Connecticut; and we cannot glean an equal protection violation from the single fact that two legislative districts in Texas differ from one another by as much as 9.9%, when compared to the ideal district.” (See, also, Gaffney v. Cummings (412 U. S. 735), holding that a total deviation of 7.83% in the Connecticut districting plan for its Legislature required no justification by State policy. Thus, in view of the White and Gaffney decisions accepting variations in State Legislatures of 9.9% and 7.83% without policy justification, there can now be no serious question concerning the constitutionality of the 9.02% total variation in the plan proposed here for a local legislature, where even broader deviations would be permissible. (Abate v. Mundt, 403 U. S. 182, supra.)
This court concludes, then, that the total deviation in the county plan between the 1st District and the 24th District of 9.02% with average deviation from the mean population of 2.67% is within constitutionally permissible limits.
THE CONTENTION OF THE VILLAGE OF NORTH SYRACUSE THAT THE PLAN IS INVALID IN THAT IT PLACES THE VILLAGE IN TWO SEPARATE DISTRICTS
Plaintiff-intervenor first argues that the proposed county plan with a total population deviation of 9.02% would only be “ constitutionally acceptable ” if justified by such policy considerations as preserving the integrity of political subdivisions — specifically and most importantly preserving the integrity of the Village of North Syracuse, citing Swann v. Adams (385 U. S. 440) and Abate v. Mundt (25 N Y 2d 309, supra). It is immediately apparent that this contention of the village is totally inconsistent with its request, as plaintiff-intervenor, that the court adopt the North Syracuse Plan which is identical to the *850 county plan (except for Districts Nos. 3 and 14) and has exactly the same population variation being complained of — 9.02%. Furthermore, under the June 18, 1973 Supreme Court decisions, White v. Regester (supra) and Gaffney v. Cummings (supra), a 9.02% maximum deviation in a local legislative body would be constitutionally permissible even without justification in State or other policy considerations.
Also, plaintiff-intervenor argues that the residents of the village are opposed to being in two districts and that they cannot receive proper representation in the County Legislature unless the village is placed in one district. In short, it contends that policy considerations, including the desires and best interests of the village residents, compel the inclusion of the Cicero portion of the Village of North Syracuse in District No. 14 with the Town of Clay by drawing the line eastward into - Cicero along the irregular semicircular path of the village line. The minutes of the Reapportionment Commission meetings show that these same arguments in favor of placing all of North Syracuse in one district were repeatedly made by Mayor Stott, considered by the commission, and unanimously rejected.
It seems apparent that the commission attached considerable weight to the contrary views of Michael Bragman, a County Legislator of the Democrat Party presently representing portions of the Brewerton area and of the Village of North Syracuse in the Town of Cicero. Mr. Bragman contended that it was “ more important to consider a town as a whole ” (i.e. Cicero) than to violate the Clay-Cicero boundary in order to put the Village of North Syracuse in one district. Also, the commission presumably considered the opposition of the residents of the Brewerton area to the division of the Brewerton community which would result from placing Brewerton in District No. 3 as urged by Mayor Stott.
The county, in its brief, argues that adherence to the village line, as proposed by Mayor Stott, would still leave the heavily populated North Syracuse community split between two districts, since it extends well beyond the village limits eastward into the Town of Cicero. Because the North Syracuse Plan thus divides two communities — North Syracuse and Brewerton —'the county maintains that its plan is superior in that it provides for one of these communities — Brewerton—to be entirely included within a-district and to remain intact.
Finally, those opposed to the North Syracuse Plan point out that the present county legislative districting follows the Cicero-Clay boundary line through the Village of North Syracuse. *851 Indeed, historically, the Clay and Cicero residents of the North Syracuse area have always had separate representation in the County Legislature and its predecessor, the Board of Supervisors. Thus, they contend that adoption of the Mayor StottNorth Syracuse Plan would disrupt not only the natural town dividing line between the districts but what has come to be accepted as the traditional legislative district division.
After hearing the conflicting views on the matter, the commission and the Legislature were confronted squarely with a policy choice — either keep the traditional town boundary and divide the Village of North Syracuse, thereby permitting the Brewerton community to remain in one district — or put the Clay portion of' North Syracuse in the district with Cicero in order to adhere to the village line, and thereby, split the Brewerton community. This court cannot agree with plaintiff-intervenor that the decision to retain the traditional Clay-Cicero dividing line was illogical or unreasonable.
But whatever the pros and cons of the two proposals, the bipartisan Reapportionment Commission ultimately accepted the division of Districts No. 3 and No. 14 along the Clay-Cicero line as requested by County Legislator Bragman. The commission’s unanimous decision was approved by the Legislature with a vote of 18 to 4. That this was not a partisan issue is shown by the fact that of the 18 favorable votes four were Democrats ; and three of the four votes in opposition were Republican with only one Democrat opposed.
No valid reason has been shown for not accepting this decision of the Legislature and for imposing instead by judicial decree Mayor Stott’s proposal, which both the commission and the Legislature duly considered and rejected. In this court’s opinion, to override the collective policy decision of the elected representatives of the residents of Onondaga County on this point would, under the circumstances, be an unwarranted and unwise act of judicial interference in a legislative function for which there is no support or justification in the reported decisions.
The rule that reapportionment “ is primarily a matter for legislative consideration and determination,” (Reynolds v. Sims, 377 U. S. 533, 586 [1964]) has been so often stated by the Supreipe Court as to require little discussion. (Burns v. Richardson, 384 U. S. 73 [1966]; Ely v. Klahr, 403 U. S. 108, 114; Mahan v. Howell, 410 U. S. 315.)
The New York courts, also, have hewed to the rule. (Matter of Smith v. Board of Supervisors of St. Lawrence County, *852 148 N. Y. 187; Graham v. Board of Supervisors, Erie County, 51 Misc 2d 942; Morrison v. Board of Supervisors of Oswego County, 62 Misc 2d 416 [1970].) The Court of Appeals in Matter of Schneider v. Rockefeller (31 N Y 2d 420, 428 [Dec. 28, 1972]), commented: “We conclude, therefore, that where, as here, the Legislature has made a good-faith effort to comply with the mandate of the equal-population principle (as evidenced by the near equality of population in the legislative districts), and has not unduly departed from our State constitutional command that the integrity of counties be preserved, the legislative plan ought to be upheld.”
Finally, in a most recent decision, Prentiss v. Cahill (73 Misc 2d 245, 248), involving the reapportionment of Albany County, where alternate plans were proposed, Justice Mahoney, in adopting the plan approved by the Legislature, stated: “ It is the court’s view that the People of Albany County are better served by having a plan proposed for approval that has been passed upon by their elected representatives, particularly when there is sufficient time for the court to constitutionally test the legislative plan and impose the same, if found valid, in time for the forthcoming general election.” and further: “The court does not have to weigh contending plans and determine if one is superior to the other. Bather, the court sees its function as judicially determining the constitutionality of the plan proposed by the legislative body charged with that duty, Reynolds v. Sims (377 U. S. 533). Judge Jasen of the Court of Appeals Stated this view more succinctly in the case entitled Matter of Schneider v. Rockefeller (31 N Y 2d 420, 427) as follows : ‘ While petitioners urge several alternate plans which they claim approach mathematical exactness and minimize or eliminate violations of county lines, we would emphasize that it is not our function to determine whether a plan can be worked out that is superior to that set up by chapter 11. Our duty is, rather, to determine whether the legislative plan substantially complies with the Federal and State Constitutions.’ ” and further on page 251: “In my view, it is not the duty of thé court to police the political effect of legislatively proposed plans of reapportionment. If such plans meet the requisite constitutional standards, in that they are not patently invidious in proposing a political scheme of gerrymandering, they are entitled to approval”
It is this court’s conclusion, therefore, that, considering the above decisions, no facts or circumstances have been shown which could give legal sanction to rejection or alteration by *853 judicial decree of Districts Nos. 13 and 14 as shown on the county plan adopted by the Legislature.
THE COURT REJECTS THE WEIGHTED VOTING PROPOSAL AND ADOPTS THE COUNTY PLAN IN ITS ENTIRETY AS APPROVED BY THE LEGISLATURE.
The request of plaintiffs Stott, Miller and Patrie for the imposition of an interim plan of weighted voting for the 1973 election is apparently based on the assumption that the court would find the county plan unconstitutional. Plaintiffs have presented no program or plan for weighted voting. The computer analysis that would be required has not been done and, to the knowledge of the court, has not been arranged for.
For the reasons stated the court has determined that the county plan is valid and constitutional. It appears to have substantial legislative and community support, while there has been to date no support from any quarter for weighted voting. No reason has been suggested for discarding the County Plan for a weighted voting scheme, which no one seems to want, which would require time consuming and expensive computer analysis (Franklin v. Krause, 32 N Y 2d 234; Iannucci v. Board, of Supervisors of County of Washington, 20 N Y 2d 244) and which is not judicially favored. (Grotke v. Board of Supervisors of Cayuga County, 62 Misc 2d 953, 956.) The weighted voting proposal is, therefore, rejected.
The court judicially approves and adopts the county plan in its entirety as the interim districting plan for the 1973 elections and, under certain conditions as hereinafter set forth, as the final districting plan.
THE IMPLEMENTATION OE THE PLAN
The court has several options for implementing the plan. Some have been suggested, including:
(1) enacting the plan outright by judicial decree with no referendum, either mandatory or permissive (see Honig v. Board of Supervisors of Rensselaer County, 31 A D 2d 989, affd. 24 N Y 2d 861; Duquette v. Board of Supervisors of Franklin County, 32 A D 2d 706; and Town of Greenburgh v. Board of Supervisors of Westchester County, 32 A D 2d 892, affd. 25 N Y 2d 817);
(2) ordering a special referendum to approve the plan in advance of the 1973 elections (see Treiber v. Lanigan, 25 A D 2d 202);
(3) ordering the plan adopted as an interim measure for the November, 1973 elections of the legislators, and directing a ref *854 erendum to be held, as to the reapportionment plan, simultaneously with the November elections, and
(4) ordering the plan to be adopted as a local law by the Legislature— thus, subjecting it to a permissive referendum pursuant to the Municipal Home Rule Law, if sufficient signatures are obtained requesting a referendum (see Prentiss v. Cahill, 73 Misc 2d 245, 251).
The circumstances suggest that no referendum of any kind may be needed and that one should not be mandated. Unquestionably, the county plan has been carefully and thoughtfully prepared so as to bring it well within the constitutional limits of acceptable population deviation and to reflect, insofar as possible, the varied views and interests of concerned political and civic groups. It has had broad bipartisan support in the Legislature, and is the product of a series of public meetings conducted by the Reapportionment Commission as a result of which much of the opposition voiced to the previous plan seems to have been eliminated. Therefore, to mandate a referendum might be ordering an expensive and time consuming procedure which could prove not only to be unnecessary but unwanted by the voters.
Clearly, a special mandatory referendum in advance of election, even if desired, should not be ordered since the additional period of delay and uncertainty as to the district boundaries would not allow sufficient time for the circulation of independent nominating petitions and the filing of party designating certifl-. cotes to be accomplished prior to the deadline — August 23,1973.
This court is of the opinion that the suggested alternative of adopting the plan by local law, thereby making it subject to the permissive referendum provisions of section 34 of the Municipal Home Rule Law, has much to commend it. If a sufficient number of voters request it, a referendum will be held. If it develops that a referendum is neither necessary nor desired by the voters, the county will be spared a useless and expensive procedure.
Therefore, this court will adopt, approve and impose by judicial decree the county plan as approved by the Legislature on June 15, 1973 as the districting plan for the 1973 elections of 'County Legislators and as the interim districting plan for Onondaga County commencing January 1,1974 to be effective as such interim plan until superseded or until adopted as the permanent plan. The plan may be adopted as the permanent districting plan by the Legislature as a local law pursuant to the Onondaga County Charter and section 34 of the Municipal Home Rule *855 Law at any time up to and including May 31, 1974, thereby making the plan subject to a permissive referendum to be held at the time of the 1974 general elections; or the Legislature may itself, if it chooses, provide for a referendum pursuant to section 34 of the Municipal Home Rule Law. If the plan is not adopted as the permanent plan on or before May 31, 1974 by local law, the Onondaga County Board of Elections is directed to place the districting plan on the ballot in the November, 1974 general elections for approval by the voters as the permanent districting plan for the Onondaga County Legislature. This court is retaining jurisdiction herein, and, in the event that a referendum is held and the county plan should not be approved, the court will make such other order or direction concerning the adoption of a new plan as may be warranted.