James W. SUTTON, Jr., et al.,
Plaintiffs,

v.

George W. DUNNE et al., Defendants.

No. 73 C 2021.

United States District Court,
N. D. Illinois, E. D.

Oct. 11, 1973.

Richard A. Makarski, Randall L. Mitchell, Chapman & Cutler, Chicago, Ill., for plaintiffs.

Bernard Carey, State's Atty. of Cook County, Sheldon Gardner, John A. Dienner, III, Asst. State's Attys., for defendant.

## MEMORANDUM OPINION

WILL, District Judge.

Plaintiffs have brought this action under 42 U.S.C. § 1983 seeking reapportionment of the membership of the Board of Commissioners of Cook County (the County Board). As presently constituted, the membership of the County Board overrepresents citizens residing in the City of Chicago, and underrepresents citizens residing in that portion of Cook County lying outside the city limits. The resulting dilution of suburban votes is alleged to constitute a violation of those citizens' rights to equal protection of the laws guaranteed by the Fourteenth Amendment. Both parties agree that there is no disputed issue of material fact, have submitted a stipulation of adjusted population figures, and have moved for the entry of summary judgment. For the reasons set out below, summary judgment will be entered in favor of the plaintiffs.

## I

The facts of this case are easily stated. Historically, the County Board has consisted of fifteen members, ten of whom are elected from the City of Chicago (the City), and five of whom are elected from suburban Cook County (the Suburbs). This distribution gives the City electorate 66.67% of the voting power on the Board, and the Suburban electorate 33.33%. In contrast, the population distribution between the two districts, based on the adjusted 1970 Census Bureau figures for Illinois,[1] reveals that the City's population of 3,514,868 is only 61.80% of the total while that of the Suburbs, 2,172,168, is 38.20%. The total disparity, computed by adding the City's over-apportionment to the Suburb's under-apportionment, is 9.74%. As discussed more fully below, these figures take into account and reflect the Census Bureau's own estimates of what per cent of white and black persons were undercounted in the 1970 census.[2]

Looked at another way, each member of the Board elected by the City voters represents 351,487 persons, while each member elected by Suburban voters represents 434,434. This difference of 83,047 results in a dilution of the weight of a vote cast by suburban voters of 20% as compared with City voters.

The recently approved Illinois Constitution of 1970, S.H.A., contains a provision for, and mechanism whereby, the Board has the power to increase the number of its members beyond fifteen "if necessary to comply with apportionment requirements."[3] The Board, by a divided vote of 8–6 and one abstention, defeated a proposed ordinance to adjust the representation on the Board to 9 elected by the City voters and 6 elected by Suburban voters in light of the new census figures. Plaintiffs now seek a court order compelling the Board to re-apportion itself either by reallocating the present membership on a 9 to 6 basis, or by increasing the membership to 16, 10 of whom would be elected by the City and 6 of whom would be elected by the Suburbs. This would result in giving the City voters 62.5% of the representation on the Board, and the Suburban voters 37.5%. Total variance would then be only 1.4% and would constitute the smallest feasible deviation.

Defendants respond by arguing that since no discrimination based on race or other judicially recognized discriminatory factor has been alleged, that the raw numerical disparities present here are not large enough to constitute a prima facie case of invidious discrimination so as to deprive plaintiffs of their right to equal protection of the law. They read the recent Supreme Court decisions in Gaffney v. Cummings, 412 U. S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) and White v. Weiser, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335

1. Bureau of the Census, "General Population Characteristics," PC (1)–B 15, Illinois (issued October 1971).

2. See Appendix A appended to this opinion for the computation of the adjusted total based on the Census Bureau's undercount estimates.

3. Schedule 1, Section 5(b) of the 1970 Illinois Constitution provides:
In Cook County, until (1) a method of election of county board members different from the method in existence on the effective date of this Constitution is approved by a majority of votes cast both in Chicago and in the area outside Chicago in a county-wide referendum or (2) the Cook County Board by ordinance divides the county into single member districts from which members of the County Board resident in each district are elected, the number of members of the Cook County. Board shall be fifteen except that the county board may increase the number if necessary to comply with apportionment requirements. If either of the foregoing changes is made, the provisions of Section 3(a) of Article VII shall apply thereafter to Cook County.
(Section 3(a) of Article VII merely provides the procedures to be followed to alter the method of election of Board Members.)

(1973) as precluding judicial intervention into state and local reapportionment questions unless the alleged numerical disparities are greater than 10%, absent an additional claim of racial or political discrimination.

We think defendants misinterpret the Supreme Court's rulings. Admittedly, the Court expressed concern over the amount of judicial time and effort being expended, perhaps fruitlessly, in the area of reapportionment, and stated:

> It is now time to recognize, . . . that minor deviations from mathematical equality among state legislative districts are insufficient to make a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State. 93 S.Ct. at 2327.

But this language cannot be taken out of the context of both previous Supreme Court decisions and the facts of the *Gaffney* and *White* cases themselves.

■ In the first place, the Supreme Court has consistently rejected the approach of setting a fixed, numerical or percentage deviance either small enough to be considered de minimis or large enough to guarantee a finding of invidiousness. See Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). Nor did the Court retreat from this sound policy and embrace any such magical numbers in *Gaffney* or *White*. The discussions in those opinions of the various types of situations and factors to be considered and standards to be applied makes clear that the Court is once again reiterating a flexible approach depending on the particular set of circumstances of each case. All that *Gaffney* specifically holds is that federal courts are no longer required to entertain suits as a matter of course, challenging a state's apportionment whenever the raw population figures show *any* deviation from numerically ideal districts.

*Gaffney* involved the redistricting of the entire state of Connecticut for which several plans had been presented to the Court. Some provided closer numerical equality than others, but required greater destruction of historical political and governmental boundaries. Those which preserved the integrity of existing boundaries maintained or increased the numerical disparities, or affected traditional and recognized political balances. The Court's legitimate exasperation over getting "bogged down in a vast, intractable, apportionment slough," (93 S.Ct. at 2330), when the median deviations among the districts were only .47% for the state senate and 1.9% for the state house, was justified by its realistic appraisal that *no* plan would achieve perfection. In such a comprehensive restructuring, there are simply too many legitimate factors to be considered, many of which work at cross purposes. Given the uncertainty and importance of many other factors beyond the raw population figures alone, such as population trends and differences in age group and voter registration patterns, it would be naive to assume that "equality" of voting power among all districts was attainable. And, whichever plan was finally approved would have to be subject to continuing attack because it would still deviate from numerical equality.

■ Confronted with such an insoluble and unending problem, the Court held that when the redistricting of an entire state was involved, and only slight numerical deviations were present, a district court could, in essence, make a presumption at the outset that the numerical differences were the result of the numerous legitimate competing state interests, rather than arrive at this conclusion only after the long and tedious process of submission and analysis of various plans. Only when invidiousness based on factors other than numerical deviation, such as race, is alleged, or, when the numerical deviations are so

great as to justify an inference that factors *other* than legitimate state interests are at work, should a court embark on the long road of inquiry into particular plans. The Court found a basis for making this kind of presumption in its earlier rulings that state legislative and local governmental reapportionments were held subject to a less stringent standard than that applied to Congressional redistricting. See e. g., Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) and Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

■ This hardly forecloses, as defendants here argue, inquiry into anything other than numerical variances for the purposes of determining whether or not a claim has been stated in every case. The situation presented here is entirely different from those in *Gaffney* and *White*. First, this case involves only one county with only two divisions, not an entire State. The proposed plan requires no alteration whatsoever to any existing geographic, political or historic boundaries between them. Second, to the extent they are comparable, the numerical deviation involved here is much greater than that found in those cases.[4] Third, there are no other competing legitimate state interests to consider. Fourth, the fashioning of fair and effective relief, could scarcely be easier. In short, none of the complex factors which the Supreme Court found could reasonably be presumed to exist in a case involving the redistricting of an entire state are present here.

Defendants' only asserted justification for the disproportionate membership ac-

corded the City is their fear that the Census figures significantly undercounted the City's population, and thus, that any increase in the representation accorded the Suburbs will result in the under-representation of the City. That concern, as noted above, has already been averted to in the population figures stipulated to and submitted by the parties. The manner in which the adjusted totals were computed is set out in full in Appendix A, appended to this opinion. The parties used the Census Bureau's own estimates of what proportion of blacks and whites were undercounted, then multiplied those percentages by the number of blacks and whites in the City and Suburbs respectively, to arrive at the adjusted totals. That process reduced an apparent initial disparity of 10.68% to 9.74%. The proposed plan to increase the County Board's membership to 16 would reduce this variance to only 1.4%, which would still favor the voters in the City.[5] Consequently, we do not see how the City's interests are in any way jeopardized since there no longer remains any factual basis for their expressed fear of under-representation.

Defendants cite no justification whatsoever beyond this one factor, now disposed of, for a variation as large as 9.74% between the two districts. For the very same reason that the Supreme Court standard allows greater disparity in some situations than in others, because of certain relevant and legitimate competing interests, we are compelled to find that here, where no such other considerations exist, the tolerable deviation from numerical equality should be very small indeed. Given a total absence of any rational or legitimate interest inhib-

---

4. As noted above, the median deviations in *Gaffney* were only .47% for the state senate and 1.9% for the state house. In *White*, the average deviation among the congressional districts of Texas was only .745%. The "average" deviation in this case is 4.9% (each of the two districts involved varies 4.9% from mathematical equality).

5. The plaintiffs' alternative proposal, to alter the allocation of the existing membership

from 10 to 5 to 9 and 6, would result in the City being accorded 60% and the Suburbs 40%. This plan would reduce the total variance to 3.60%. In light of the Illinois Constitution's contemplation of the need to increase the size of the County Board to reflect apportionment needs and since the addition of one member to the Board brings the variance down to only 1.4%, we have focused only on this latter proposal to increase the membership of the County Board by one.

iting apportionment as nearly equal as practicable, and the ease with which the Board's size can be increased to achieve this result, we find plaintiffs' rights have been infringed and they are entitled to relief.

Consequently, finding the numerical disparity is constitutionally significant and that plaintiffs are entitled to relief, their motion for summary judgment will be granted. The Board will be ordered to increase its total membership from 15 to 16. Ten of these members are to be elected by the City and six by the Suburbs.

An appropriate order will enter.

## APPENDIX A

### POPULATION AND VARIANCE INFORMATION FOR CHICAGO AND SUBURBAN COOK COUNTY

#### I.

THE PERCENTAGE VARIANCE BETWEEN THE PRESENT APPORTIONMENT OF THE COOK COUNTY BOARD OF COMMISSIONERS AND THE 1970 POPULATION OF CHICAGO AND SUBURBAN COOK COUNTY AS REPORTED BY THE BUREAU OF THE CENSUS IS 10.68%.

#### COMPUTATION

| | Population * | Percent |
|---|---|---|
| Chicago | 3,369,359 | 61.33 |
| Suburbs | 2,124,170 | 38.67 |
| Total Cook County | 5,493,529 | 100.00% |

| | Commissioners | Percent of Apportionment | Population Percent |
|---|---|---|---|
| Chicago | 10 | 66.67 | 61.33 |
| Suburbs | 5 | 33.33 | 38.67 |
| Total Cook County | 15 | 100.00% | 100.00% |

Variance is the difference between the percent of apportionment and percent of population. The variance for Chicago is added to the variance of the Suburbs to determine total variance, as follows:

| Chicago % of apportionment | 66.67 | Suburbs % of apportionment | 33.33 |
|---|---|---|---|
| Less population % | 61.33 | Less population % | 38.67 |
| | 5.34% | | — 5.34% |

| Chicago over apportionment | 5.34 |
|---|---|
| Add: Suburbs under apportionment | 5.34 |
| Total Cook County variance | 10.68% |

## II.

THE PERCENTAGE VARIANCE BETWEEN THE PRESENT APPORTION-
MENT OF THE COOK COUNTY BOARD OF COMMISSIONERS AND
THE ADJUSTED 1970 POPULATION OF CHICAGO AND SUBURBAN
COOK COUNTY BASED ON THE BUREAU OF THE CENSUS' ESTI-
MATED UNDERCOUNT IS 9.74%.

### COMPUTATION

| | ADJUSTED POPULATION ** | ADJUSTED PER CENT |
|---|---|---|
| CHICAGO | 3,514,868 | 61.80 |
| SUBURBS | 2,172,168 | 38.20 |
| TOTAL COOK COUNTY | 5,687,036 | 100.00% |

| | COMMISSIONERS | PER CENT OF APPORTIONMENT | ADJUSTED POPULATION PER CENT |
|---|---|---|---|
| CHICAGO | 10 | 66.67 | 61.80 |
| SUBURBS | 5 | 33.33 | 38.20 |
| TOTAL COOK COUNTY | 15 | 100.00% | 100.00% |

Variance is computed as above.

| Chicago % of apportionment | 66.67 | Suburban % of apportionment | 33.33 |
|---|---|---|---|
| LESS: Adjusted population % | 61.80 | LESS: Adjusted population % | 38.20 |
| | 4.87 | | — 4.87 |

| | |
|---|---|
| Chicago OVER apportionment | 4.87 |
| ADD: Suburbs UNDER apportionment | 4.87 |
| TOTAL ADJUSTED COOK COUNTY VARIANCE | 9.74% |

* Source: Bureau of the Census, "General Population Characteristics," PC (1)–
B 15, Illinois (issued October 1971)

** Source of adjustment: "Census Bureau Report on 1970 Census Coverage,"
U. S. Dept. of Commerce News, 25 April 1973.

Method of adjustment: The Census Bureau estimates that white persons were
undercounted by 1.9% and black persons by 7.7% in the 1970 census. Chicago's
black and other non-white population (41.7% of the City's total population) was
increased by 7.7% and Chicago's white population was increased by 1.9%. The
suburban population was similarly adjusted (6.2% of suburban population is black
and other non-whites).