Charles PERRY and Charles Hudson

v.

CITY OF OPELOUSAS.

Civ. A. No. 19576.

United States District Court,
W. D. Louisiana,
Opelousas Division.

May 10, 1974.

Leon S. Haas, Jr., Richard B. Millspaugh, Opelousas, La., for plaintiffs.

Felix A. DeJean, III, James P. Doherty, Opelousas, La., for defendants.

Marion Overton White and Joshua J. Pitre, Opelousas, La., Gerald W. Jones and Michael Scadron, Civil Rights Div., Voting & Public Accommodations, U. S. Dept. of Justice, Washington, D. C., for intervenors.

NAUMAN S. SCOTT, District Judge:

JUDGMENT

On November 12, 1973, plaintiffs, a black registered voter and a white registered voter, filed a complaint against the City of Opelousas, its Mayor and its five aldermen. The complaint alleges that the current apportionment scheme is in violation of the "one man-one vote" principle and prays that the City of Opelousas be reapportioned accordingly. Under the current plan, the City is divided into four wards (voting districts). One alderman is elected from each ward. The Mayor, Chief of Police, and a fifth alderman, are elected at-large. Black citizens of Opelousas intervened (intervenors) on December 15, 1973 in order to doubly insure the protection of XV Amendment rights, and on January 14, 1973 the Attorney General of the United States intervened expressing "an interest in the subject matter of the case because of the requirements of Section 5 of the Voting Rights Act, 42 U.S.C. 1973c."

This action arises under the Constitution of the United States, Article 4, Section 4; under the XIV Amendment to the Constitution of the United States; under the XV Amendment to the Constitution of the United States; and under Title 42, United States Code, Sections 1983 and 1988. Jurisdiction exists by virtue of Title 28, United States Code, Sections 1331 and 1343.

The parties tendered a total of fifteen proposed reapportionment plans [1] based primarily on the 1970 census, and the entire issue was submitted to the court predicated upon those plans, stipulations, affidavits, depositions and memoranda on April 8, 1974.

### 1970 CENSUS

Certain ambiguities and omissions exist in the 1970 census. An examination of the Official Bureau of the Census Enumeration District (ED) Map No. 193783 reveals several EDs for which there are no ascertainably corresponding population figures on the official ED computer print-out. On the census map, EDs 40 and 23 are variously broken up into several ED 40 (parts) and several ED 23 (parts). Without further information it is impossible to assign a population figure from the print-out to its appropriate ED (part).

As a result of this dilemma the City conducted an independent census of all the EDs labeled 40 (part) and 23 (part), and of post-1970 annexations (INC). The City then combined the findings of the independent census with that usable portion of the official 1970 census to arrive at a population breakdown upon which it based its plans. The Black plaintiff and intervenors proceeded to draw up their plans without the benefit of an independent census but dealt as logically and reasonably as could be expected with the census ambiguities. In essence, none of the parties had agreed on a standard or common population count for the City of Opelousas in the preparation of their plans. Thus there was no "yardstick" common to all plans for comparative purposes.

In an effort to resolve this predicament the Black plaintiff, the intervenors, and the United States filed affidavits expressing how they interpreted and disposed of the ED 40 and ED 23 problem. The affidavit filed by the United States, premised on advice from the Census Bureau itself, indicated that the computer print-out figures for ED 40A and ED 40B correspond with that ED 40 (part) in the southwest quadrant of Opelousas, and that ED 40C is located in the northwest quadrant. However, the same affidavits also reflect that these parties could only speculate as to the correct population counts for the various ED 23s.

There is no objective basis for accepting the accuracy of the City census updating the regular 1970 census. Consequently the official 1970 census figures were used in evaluating each of the 15 plans except in ED 23 and in INC. The judgment of the Census Official was accepted in regard to ED 40 (parts). The City census was accepted as the only accurate figures available for ED 23 (parts) and INC.

Using these figures, Opelousas has a total population of 20,244.[2] Also, using these figures each of the plans submitted by the parties were recapitulated [3] so that they might be systematically and equally compared with respect to three overriding considerations: (1) The requirement that one man's vote be, insofar as is practicable, the equivalent of another's, Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). (2) The dilution of minority voting strength under the XV Amendment, White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Zim-

---

1. The black plaintiff submitted seven plans, the City submitted six and the intervenors submitted two. The United States submitted no plans. The City admitted that the previous apportionment scheme failed to meet the one man-one vote standard and consequently did not offer it as one of their alternative plans.

2. See EXHIBIT "A", Population of Opelousas By Enumeration District, filed in the record and made a part thereof.

3. EXHIBITS "B" through "N" filed into the record and made a part thereof manifest the results of these recapitulations. We did not recapitulate Intervenor Plan 8-2 since it was identical with Plaintiff Plan 8-2 (EXHIBIT "H"), nor Intervenor Plan 7-W since it improperly split an Enumeration District.

mer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973); Turner v. McKeithen, 490 F.2d 191 (5th Cir. 1973). (3) The practical aspects of implementing a new apportionment scheme.

### CITY PLAN–5

Each of the proposed plans was thoroughly evaluated.

■ City Plan 5, Exhibit "M", was adopted by the City of Opelousas at the direction of the Attorney General, and approved with conditions by the Attorney General. Despite his approval the Attorney General has noted Fifteenth Amendment deficiencies in the plan. We concur. City Plan–5, currently in effect, must be nullified, the approval of the Attorney General, notwithstanding. United States of America v. Rapides Parish School Board, et al (W.D.La.) 1973, C.A. No. 13,715.

### PLAINTIFF PLAN 5–1

■ After evaluating the proposed plans in the aforementioned manner, we have concluded that the plan submitted by the Black plaintiff, designated as Plaintiff Plan 5–1 (hereinafter referred to as Plan 5–1) best guarantees the constitutional principles of Reynolds v. Sims, *supra*, and its progeny.[4] Plan 5–1 creates five single member districts. Between these five districts, the total deviation from the ideal representation is 6.2%.[5] On the average, each district varies 2.1%. It is clear that a total variance of 6.2% is well within permissible limits. In White v. Regester, *supra*, the Supreme Court indicated that a 9.9% deviation in a state reapportionment scheme was not in violation of the XIV Amendment. A figure as high as 16.4% has been held not to exceed constitution-

al guidelines. See Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). In a reapportionment plan for city government a total deviation of only 6.2% must be considered exceptionally low.

In addition to surpassing the requirements of Reynolds v. Sims, *supra*, Plan 5–1 exhibits, geographically, a logical and artful division of the city. The five districts are cohesive and as uniform as practicably possible. The voting districts do not appear "gerrymandered". This will undoubtedly contribute to ease registration of voters and administration of city elections.

In adopting Plan 5–1, we modify it to the extent that a sixth alderman shall be elected at-large as provided for in the Lawrason Act.[6] We are mindful of the United States' written objections to the at-large alderman in the City's four district plan and have carefully considered its effect upon XV Amendment rights and, more specifically, whether or not it contributes to the dilution of the black vote in connection with Plan 5–1.

■■ It bears repeating that "multimember districts are not per se unconstitutional". White v. Regester, *supra*, 412 U.S. at 765, 93 S.Ct. at 2339, 37 L. Ed.2d at 324. Similarly, a provision for the at-large election of a sixth alderman from a city divided into five single member districts does not automatically dilute minority voting strength. It is conceivable that a plan comprised entirely of single member districts could be drawn in such a fashion to insure the minority voice is offset in every single district. The point is that an apportionment scheme has to be viewed in light of its particular application to a specific community. Plan 5–1 bears none of the

---

4. See APPENDIX to Judgment of the Court.

5. Among all the plans submitted, deviations from the ideal ranged from a high of 22.8% to a low of 6.2%.

6. LSA–R.S. 33 :321 et seq. In 1898 the Lawrason Act was passed providing for the lo-

cal adoption of the "Mayor and Board of Aldermen" form of city government. Opelousas is chartered as this type of city government. Section 381 allows for the election of an alderman-at-large. The Mayor and Chief of Police are also elected at-large.

defects of those condemned by the Supreme Court or the Fifth Circuit in the above cases. There is no irrational or haphazard mixture of single and multi-member districts with the resultant "crazy quilt" effect that was considered objectionable in Kilgarlin v. Hill, 386 U. S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771, 772 (1967). *See, also,* Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). Nor are multi-member districts bunched in populous centers so as to dilute the more significant segments of the minority vote as was the case in White v. Regester, *supra.* The most cursory inspection of Plan 5–1 will reveal that the voting districts have not been delineated in such a manner that the black population is fragmentarily submerged into five white majority voting districts.

Furthermore, there is a rational purpose to the addition of an at-large alderman. The Louisiana Legislature has allowed for, and the City of Opelousas has, heretofore, chosen to elect an alderman-at-large. In so doing, these bodies have taken into consideration the well known fact that city governments, especially in their administrative capacity, tend to be highly ward-oriented. Such parochialism can be counterproductive in the resolution of city-wide problems. The addition of an at-large representative can inhibit, if not remedy, this consequence, without diluting the minority vote. In the specific instance of Opelousas, a city whose population is 49% white and 51% black, any alderman who hopes to be elected at-large would have to campaign for and secure the trust and support of both the black and white community. He or she would have to be a candidate for the entire city.

The Supreme Court has held that access to the political process is the barometer for dilution of minority voting strength, and that the principle of one man-one vote insures adherence to the Equal Protection Clause of the XIV Amendment. Whitcomb v. Chavis, *supra,* at 149–150, and White v. Regester,

*supra,* at 765. Plan 5–1 guarantees both and, accordingly, we adopt it.

## ORDER

It is ordered, adjudged and decreed, that:

The plan of apportionment currently in effect in the City of Opelousas is null, void and of no further effect, and that the City is hereby reapportioned in accordance with Plaintiff Plan No. 5–1.

The injunction issued herein on February 19, 1974 is made permanent. In view of the fact that the new plan will require substantial administrative changes of a time consuming nature on the part of the Registrar of Voters and the Municipal Executive Committees of the political parties involved, it will be necessary to upset the General Election regularly scheduled for June 11, 1974 and establish a complete new timetable. Additionally, by adopting a new plan and instituting new voting districts, the complexion of the campaigns, constituencies, and election will be so altered as to necessitate the requalification of all candidates.

After conferring with the Registrar of Voters, the Court has constructed the following timetable:

1) April 25, 1974—Municipal Executive Committees of all political parties shall meet and issue a call for the elections;

2) April 29 and 30, 1974—Qualifications;

3) June 8, 1974—First Primary Election;

4) June 22, 1974—Second Primary Election; and

5) July 9, 1974—General Election.

Encumbents shall remain in office until August 1, 1974, at which time those newly elected shall assume their duties.

This supplemental and amended judgment will serve as the judgment of this Court.

Appendix to follow

APPENDIX TO JUDGMENT OF THE COURT

PLAINTIFF PLAN 5 – 1

IDEAL REPRESENTATION: 1/4049

| VOTING DISTRICT | E D | WHITE (%) | NON-WHITE (%) | TOTAL |
|---|---|---|---|---|
| A | 23 A | | 200 | 200 |
| | 24 | 998 | 275 | 1273 |
| | 30 | 526 | 795 | 1321 |
| | 31 | 246 | 97 | 343 |
| | 32 | 388 | 692 | 1080 |
| Total | | 2158 (51) | 2059 (49) | 4217 |
| DEVIATION: −1.2% | | | | |
| B | 25 | 58 | 682 | 740 |
| | 26 | 218 | 643 | 861 |
| | 27 | 1035 | 887 | 1922 |
| | 40 C | 70 | 506 | 576 |
| Total | | 1381 (34) | 2718 (66) | 4099 |
| DEVIATION: −4.1% | | | | |
| C | 23 B | 150 | | 150 |
| | 23 C | 200 | | 200 |
| | 33 | 95 | 1331 | 1426 |
| | 41 | 1013 | 2 | 1015 |
| | 42 | 915 | 149 | 1064 |
| | INC | 43 | 67 | 110 |
| Total | | 2416 (61) | 1549 (39) | 3965 |
| DEVIATION: +2.1% | | | | |
| D | 28 | 740 | 378 | 1118 |
| | 29 | 349 | 6 | 355 |
| | 34 | 329 | 758 | 1087 |
| | 35 | 258 | 163 | 421 |
| | 36 | 1004 | 15 | 1019 |
| Total | | 2680 (67) | 1320 (33) | 4000 |
| DEVIATION: +1.3% | | | | |
| E | 37 | 575 | 48 | 623 |
| | 38 | 313 | 578 | 891 |
| | 39 | 431 | 1016 | 1447 |
| | 40 A & B | 17 | 985 | 1002 |
| Total | | 1336 (34) | 2627 (66) | 3963 |
| DEVIATION: +2.1% | | | | |

TOTAL:  6.2%  DEVIATION                    TOTAL:  20,244