James W. SUTTON, et al., Plaintiffs,

v.

George W. DUNNE, et al., Defendants.

No. 73 C 2021.

United States District Court,
N. D. Illinois, E. D.

Dec. 22, 1981.

---

James T. Ryan, Greenberger, Krauss & Jacobs, Chicago, Ill., for defendants-cross plaintiffs, Carl R. Hansen, et al.

Henry A. Hauser, Asst. State's Atty., Richard M. Daley, State's Atty. of Cook County, Chicago, Ill., for Cook County Officials.

Mitchell Ware, LaFontant, Wilkins & Jones, Chicago, Ill., for proposed intervenor, John Stroger, Jr.

## MEMORANDUM OPINION

WILL, District Judge.

### I.

In 1973, the plaintiffs brought an action under 42 U.S.C. § 1983 seeking reapportionment of the membership of the Board of Commissioners of Cook County. When the suit was brought, the Board had fifteen members, ten elected from the City of Chicago and five from suburban Cook County. That apportionment gave the city electorate 66.67% of the voting power on the Board and the suburban electorate 33.33%. According to the 1970 Census Bureau figures for Cook County, after adjustment by the Census Bureau, the city's population was only 61.80% of the county total, and the suburbs' population was 38.20%. Under the 10–5 configuration of the Board, therefore, the city was overrepresented by 4.87%, and the suburbs were underrepresented by 4.87%. Accordingly, the total deviation was 9.74%. We found this disparity unconstitutionally diluted the voting rights of suburban voters and ordered that, commencing with the Board to be elected on November

5, 1974 and for subsequent elections, defendants increase the size of the Board to sixteen members, ten to be elected by the city and six by the suburbs. *Sutton v. Dunne*, 365 F.Supp. 483 (N.D.Ill.1973).

On November 2, 1981, recognizing population changes indicated by the 1980 census, the Board passed an ordinance decreasing the size of the Board to fifteen members, nine to be elected by the city (one less than previously) and six by the suburbs (the same number as previously). With that apportionment, 60% of the Board members would be elected from the city and 40% from the suburbs.

The movants request that we modify our 1973 order to reflect population changes in the last decade. In addition, they contend that, even after the decrease in city representation accomplished by the recent ordinance, the suburbs are still substantially underrepresented. They claim that the total deviation is 5.87% and ask that the number of members on the Board be restored to sixteen—nine to be elected by the city voters, seven by suburban voters—or to seventeen—ten to be elected by the city, seven by the suburbs.

The deviation from equality is not 5.87% as the movants contend. In calculating the deviation, they have used the raw population figures, unadjusted to reflect the percentage of the population not counted. Their figures, therefore, are probably inaccurate and cannot form the basis for our analysis of the Board's apportionment plan.[1]

We do not have accurate adjusted figures, however, since the Census Bureau has not yet estimated what percentage of the population was undercounted in the 1980 census. Our 1973 decision was reached after the Census Bureau had released its estimates of undercounts for the 1970 census. At that time, we adjusted the raw data to reflect the estimated 1.9% undercount for white persons and the estimated 7.7% undercount for nonwhite persons. Historically, the Census Bureau has adjusted its Cook County raw figures in previous censuses by comparable amounts.

Accordingly, it is reasonable to use that same readjustment formula in calculations for the 1980 census. Although the figures may later prove slightly inaccurate, based on previous experience they will be closer to the actual figures than the raw data.[2]

City of Chicago

|  | 1980 Population | Adjustment | 1980 Adjusted Population |
|---|---|---|---|
| White | 1,143,426 | 1.9% | 1,165,151 |
| Nonwhite | 1,861,635 | 7.7% | 2,004,980 |
|  | 3,005,061 |  | 3,170,131 |

Suburban Cook County

|  | 1980 Population | Adjustment | 1980 Adjusted Population |
|---|---|---|---|
| White | 1,988,406 | 1.9% | 2,026,185 |
| Nonwhite | 259,723 | 7.7% | 279,720 |
|  | 2,248,129 |  | 2,305,905 |

Total Cook County     5,476,036

1. The movants also argue that the relevant numbers are not population figures but should be registered voter figures and that the deviation is, therefore, even greater. There is, however, apparently no precedent for the use of registered voter rather than population figures.

2. If, when the Census Bureau releases the undercount adjustments, our figures are substantially inaccurate, the movants may be able to challenge the apportionment again. The only adjustments which would help the movants, however, would be if our estimated figure of a 1.9% undercount for whites is substantially lower than actual or our estimated figure of a 7.7% undercount for nonwhites is substantially higher. Based on prior census experience, this appears unlikely.

1980 Adjusted Population

| City | 3,170,131 | = | 57.89% |
|------|-----------|---|--------|
| Suburban | 2,305,905 | = | 42.11% |
| | 5,476,036 | | |

The County Board reapportionment under the recently adopted ordinance of nine seats to the city, six to the suburbs, gives the city, which has 57.89% of the population, 60% of the votes on the Board which is an overrepresentation of 2.11%. Suburban Cook County, which has 42.11% of the population would have 40% of the votes on the Board which is an underrepresentation of 2.11%. The total deviation is therefore 4.22%. On a sixteen member Board with a 9–7 apportionment, the suburbs would have 43.75% of the votes and be overrepresented by 1.64%, while the city would be underrepresented in a like amount. The total deviation would therefore be 3.28%. On a seventeen member board with a 10–7 apportionment, the suburbs would have 41.18% of the votes and be underrepresented by .93% and the city overrepresented by the same amount. The total deviation would be only 1.86%. It is clear, therefore, that the 9–6 formula adopted by a majority of the County Board is the least representative of the three possible apportionments, while the 10–7 formula is the most representative.

## II.

■ The Supreme Court requires that persons challenging an apportionment plan adopted by a state or local legislative body prove a prima facie equal protection violation; only after a prima facie case is established is the state required to present adequate justifications for the plan. *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). Whether a prima facie case has been made depends upon the size of the deviations. If the deviations are so small that no prima facie case has been established, the state does not have to justify the deviations and the existence of other plans with lower deviations is not conclusive. 412 U.S. at 740–41, 93 S.Ct. at 2324–25.

■ Although the Supreme Court has, in cases involving state or city-wide apportionments with multiple districts, held higher deviations than those at issue in this case to be within constitutional limitations, *see White v. Regester*, 412 U.S. at 764, 93 S.Ct. at 2338 (1.82% average deviation; 9.9% maximum deviation); *Gaffney v. Cummings*, 412 U.S. at 751, 93 S.Ct. at 2330 (2% average deviation; 8% maximum deviation); *see also Perry v. City of Opelousas*, 375 F.Supp. 1170 (W.D.La.1974) (2.1% average deviation; 6.2% maximum deviation), we hold that the 2.11% average and the 4.22% total deviations under the facts of this case do establish a prima facie case. The limits on tolerable deviations are much lower in a two district case because we need not fear, as the Court did in *Gaffney*, becoming "bogged down in a vast, intractable apportionment slough. . . ." 412 U.S. at 735, 93 S.Ct. at 2322. If the present plan violates the Constitution, we need not redraw any district lines and try almost countless possible variations of a state-wide apportionment map to find the ideal plan. To reduce the inequality present in the Board's recent 9–6 formula and reflect most accurately the present population ratios, we simply have to modify the 10–6 ratio which has existed since 1973 and make the apportionment 10–7.

■ To justify the 9–6 apportionment, the Board argues that adding more members would increase the budget by $80,400 per year per additional member. That is not an adequate justification. That amount is not large compared to the total annual county budget of almost one billion dollars, and a small savings cannot justify a dilution of voting rights. *Cf. Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) (16% maximum deviation justified by the

state's desire to respect traditional boundaries).

Also before us is a petition for leave to intervene filed by John H. Stroger, Jr., a minority member of the Board elected from the City of Chicago, seeking to have the Court hold that the present system of electing Commissioners at large from two districts, the city and the areas outside the city, is unconstitutional because it permits minorities to be underrepresented. The intervenor, therefore, asks that the Court order that the two-district at-large arrangement be replaced by single member districts.

 It is conceded by all that the issues sought to be raised by the intervenor are separate and distinct from that raised by the motion to amend our 1973 order establishing the 10–6 ratio so as to reflect current population figures. Moreover, the County Board has recently voted down such a proposal. While it is apparently undisputed that minorities are underrepresented both from the City of Chicago and the suburban areas, unless it could be established that the two-district system was intended to discriminate invidiously against a particular minority or minorities, no federal constitutional question would arise. This showing obviously would require substantial discovery and an ultimate trial if a court were to consider the question at all.

 It is also conceded that intervention here rests in the sound discretion of the Court. While we have stated to Commissioners both from the city and the suburbs that more equitable minority representation on the Board from both districts would clearly be desirable, we do not believe that intervention in the present proceeding is appropriate. The question of single representative districts is a subject which should be dealt with separately. Accordingly, the petition for leave to intervene is denied. Hopefully, since both the city and the suburbs will have an opportunity to elect an additional member, the minority representation will increase from the city and at least one minority representative will be elected from the suburbs.

Orders consistent with the foregoing will enter.