James W. SUTTON, et al., Plaintiffs,

v.

George W. DUNNE, et al., Defendants.

Carl R. HANSEN, et al., Defendants-
Cross-Plaintiffs Appellees,

v.

George W. DUNNE, et al., Defendants-
Cross-Defendants Appellants.

No. 82–1016.

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1982.

Decided June 10, 1982.

Rehearing and Rehearing En Banc
Denied Oct. 5, 1982.

Henry A. Hauser, William T. Harte, Chicago, Ill., for George W. Dunne, et al.

James T. Ryan, Greenberger, Krauss & Jacobs, Chtd., Chicago, Ill., for Carl R. Hansen, et al.

Before BAUER and POSNER, Circuit Judges, and GRANT, Senior District Judge.[*]

BAUER, Circuit Judge.

Defendants appeal from the district court order requiring them to increase the size of the Board of Commissioners of Cook County ("Board") from fifteen members, nine elected from Chicago and six from the suburbs, to seventeen members, ten elected from Chicago and seven from the suburbs. Defendants contend that the district court erred in ordering reapportionment because the plaintiffs failed to prove that the Board's fifteen member apportionment plan diluted their voting rights in violation of the fourteenth amendment. We affirm.

I

Plaintiffs originally filed this reapportionment suit in 1973. They alleged that the Board, which then had fifteen members, ten elected from Chicago and five elected from the suburbs, overrepresented Chicago citizens by 4.87% and underrepresented suburban citizens by 4.87%. The district court held that the 9.74% total deviation diluted the voting rights of the suburban voters in violation of the fourteenth amendment. The court ordered the Board to increase its size to sixteen members, ten to be elected from the city and six from the suburbs. The court's reapportionment plan decreased the total deviation to 1.4%, the smallest feasible deviation. *Sutton v. Dunne*, 365 F.Supp. 483 (N.D.Ill.1973). Defendants did not appeal the district court's 1973 reapportionment order.

On October 15, 1973, the Board adopted an ordinance implementing the district court's reapportionment plan. The 1974 and 1978 Board elections were held on the basis of that ordinance. On November 2, 1981, the Board passed an ordinance decreasing its size to fifteen members, nine to

[*] The Honorable Robert A. Grant, Senior Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

be elected from the city and six from the suburbs. The Board's 1981 apportionment plan was based on Cook County population figures from the 1980 census.

Plaintiffs returned to the district court to obtain modification of the court's 1973 order to reflect 1980 population changes. Plaintiffs requested the court to reject the Board's 1981 plan and order it to increase either to sixteen members, nine to be elected from the city and seven from the suburbs, or to seventeen members, ten to be elected from the city and seven from the suburbs. Using adjusted raw population figures from the 1980 census,[1] the district court calculated that the Board's 1981 plan created a 2.11% overrepresentation of Chicago citizens and a concomitant 2.11% underrepresentation of suburban citizens. The court held that the plan's 4.22% total deviation violated the fourteenth amendment. The court also rejected the plaintiffs' plan calling for a proposed sixteen member Board because that plan created an unacceptable 3.28% total deviation, with Chicago underrepresented by 1.64% and the suburbs overrepresented by a like amount. The court adopted the plaintiffs' alternate plan and ordered the Board to increase its size to seventeen members, ten to be elected from Chicago and seven from the suburbs. The court found that this apportionment plan would result in a .93% underrepresentation of the suburbs and .93% overrepresentation of the city voters, with a total deviation of 1.86%. *Sutton v. Dunne*, 529 F.Supp. 312 (N.D.Ill.1981).

## II

Defendants claim that the district court erred in ordering them to adopt plaintiffs' apportionment plan because plaintiffs failed to prove that the 4.22% total deviation in the Board's plan is of a sufficient "size and quality to amount to an invidious discrimination under the Fourteenth Amendment." *Gaffney v. Cummings*, 412 U.S. 735, 741, 93 S.Ct. 2321, 2325, 37 L.Ed.2d 298 (1973). Rather, defendants argue, the deviation is *de minimis*, and, therefore, the Board's plan is constitutionally acceptable. Defendants argue in the alternative that, even if the total deviation is not *de minimis*, the Board's plan is still acceptable because the state's policy of maintaining the Board's membership at fifteen is a sufficient justification for the 4.22% deviation.

■ The Supreme Court has declined to prescribe "any precise constitutional tests" for reviewing courts to use in determining whether a particular apportionment plan passes constitutional muster. *Reynolds v. Sims*, 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964). There is no fixed percentage deviation demarcating the *de minimis* from the unconstitutional, *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 1228–29, 22 L.Ed.2d 519 (1969); each deviation must be examined on a case-by-case basis. "What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case." *Reynolds v. Sims*, 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964).

■ Initially, plaintiffs bear the burden of proving that the deviation from popula-

---

1. The district court relied on the following adjusted census figures:

**City of Chicago**

| | 1980 Population | Adjustment | 1980 Adjusted Population |
|---|---|---|---|
| White | 1,143,426 | 1.9% | 1,165,151 |
| Nonwhite | 1,861,635 | 7.7% | 2,004,980 |
| | 3,005,061 | | 3,170,131 |

**Suburban Cook County**

| | 1980 Population | Adjustment | 1980 Adjusted Population |
|---|---|---|---|
| White | 1,988,406 | 1.9% | 2,026,185 |
| Nonwhite | 259,723 | 7.7% | 279,720 |
| | 2,248,129 | | 2,305,905 |

| Total Cook County | 5,476,036 | |
|---|---|---|
| 1980 Adjusted Population | | |
| City | 3,170,131 | = 57.89% |
| Suburban | 2,305,905 | = 42.11% |
| | 5,476,036 | |

*Sutton v. Dunne*, 529 F.Supp. 312, 314–15 (N.D. Ill.1981). Neither party challenges the accuracy of these figures.

tion equality is substantial. *Gaffney v. Cummings*, 412 U.S. 735, 745, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298 (1973). Once plaintiffs prove a prima facie case of discrimination, the burden shifts to defendants to show either that the deviation is unavoidable, *Kirkpatrick v. Preisler*, 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519 (1969), or that the deviation is justified by an attempt to effectuate a rational state policy. *Reynolds v. Sims*, 377 U.S. 533, 579, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964).

■ Although the Supreme Court has approved apportionment plans with a total deviation greater than 4.22%, *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Abate v. Mundt*, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), in only two of the cases, *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), did the Court find that the deviation was *de minimis*. In *White*, the Court held that a total deviation of 9.9% in the state house of representatives was *de minimis*, and in *Gaffney*, the Court held that a maximum deviation of 1.81% in the state senate and a 7.83% deviation in the state house of representatives were *de minimis*. In both cases the Court was exam-

ining a population deviation created by a multiple district apportionment plan. In this case, however, we are confronted with an apportionment plan that involves only two districts. Greater "mathematical exactness" between the number of citizens in each district and the number of their representatives is easier to attain when only two voter districts are involved than when multiple districts are involved. Therefore, the 4.22% total deviation in the Board's 1981 plan, although perhaps an insubstantial deviation in a multi-district case, is not *de minimis* in this two district case.[2]

Defendants contend that the Board's plan is constitutionally acceptable even though the 4.22% deviation is substantial because the Board's policy of maintaining its membership at fifteen is a sufficient justification for the deviation. In *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), and *Abate v. Mundt*, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), the Supreme Court approved total deviations of 16.4% and 11.9%, respectively, on the ground that the deviations were justified by the state policy of preserving the integrity of political subdivisions and jurisdictional lines. Defendants argue that their dual policies of preserving the historical size of the Board and saving taxpayers the $80,400 per year that each additional member would cost likewise are rational justifications for a substantial deviation from population equality.

---

**2.** Judge Grant chides us in dissent for finding a 4.22 percent deviation substantial though a higher percentage was deemed *de minimis* in *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). But a deviation can be judged large or small only in relation to the burden of correcting it. *Gaffney* was a conventional reapportionment case where the court was being asked to create election districts—to draw lines. Because of the political and geographical factors that must be accommodated in redistricting, equality of population across districts is unattainable as a practical matter, and deviations that would be substantial in other contexts must be tolerated. But this is not a redistricting case. There are two districts—the city and the suburbs of Cook County. The only question is how many county commissioners shall be elected from each. There are now 16 commissioners in all, and this number cannot be allocated between the two

districts without producing overrepresentation in one and underrepresentation in the other to an extent that all agree is intolerable. To rectify this conceded violation of the Constitution, the Board wanted to drop one commissioner and the district court wanted to add one. The district court's solution results in a substantially smaller deviation from equal representation. It does so at the cost of two commissioners' salary, which is truly *de minimis* relative to the budget of the Board. There is no argument that having another commissioner will reduce collegiality or otherwise impair the effective functioning of the Board. In these circumstances we think the district court's solution the proper one, especially against the background of a long history of overrepresentation of city residents in the composition of the Board, a factor emphasized by the district court.

Defendants' reliance on *Mahan* and *Abate*, however, is misplaced. In those cases the Court recognized that the state may have a substantial interest in maintaining slightly unequal voting districts in order to provide representation to subdivisions *qua* subdivisions. *Mahan v. Howell*, 410 U.S. at 326, 93 S.Ct. at 986; *Abate v. Mundt*, 403 U.S. at 186, 91 S.Ct. at 1907. The Cook County Board, however, can achieve this goal without deviating from population equality simply by altering its size. The defendants' arguments against making such an alteration are not persuasive. The Board has a total budget of almost $1,000,000,000. While the Board's desire to save taxpayers' $160,800 is laudable, it is not a sufficient justification for maintaining a 4.22% deviation from population equality. Nor is the Board's desire to remain at fifteen members a sufficient justification—especially since the Illinois Constitution recognizes that it may be necessary to increase the Board's size to insure population equality. Section 5(b) of the 1970 Illinois Constitution Transition Schedule provides that "the number of members of the Cook County Board shall be fifteen except that the county board may increase the number if necessary to comply with apportionment requirements." The district court did not err in finding that the Board's 1981 apportionment plan unconstitutionally diluted Cook County suburban citizens' voting rights.

The district court ordered the Board to increase from fifteen to seventeen members and thereby decrease the total deviation from 4.22% to 1.86%. "We [will] not disapprove a court-imposed minor variation from a State's prescribed figure when that change is shown to be necessary to meet constitutional requirements." *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 199, 92 S.Ct. 1477, 1485, 32 L.Ed.2d 1 (1972) (per curiam). The judgment of the district court is

AFFIRMED.

GRANT, Senior District Judge, dissenting.

I am unable to agree with the majority opinion for the following reasons.

It is fundamental that before a federal court may modify an apportionment plan enacted by a state or local governmental entity, there must be a showing that the plan fails to comport with constitutional or statutory requirements. This principle was only recently confirmed by the Supreme Court in *Upham v. Seamon*, —— U.S. ——, ——, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982). It was the judgment of the district court in this case and the majority of this panel that the appellees have adequately made a *prima facie* showing that the original 9–6 composition enacted by the Board of Commissioners of Cook County ("Board") failed to satisfy constitutional requirements. To that I cannot agree.

The only evidence in this case of a constitutional violation is the 4.22% total deviation. There is absolutely nothing in this record to suggest that the Board's 1981 apportionment plan was designed to favor the city population over the suburban. The issue here really comes down to the question as to whether the 4.22% deviation is of sufficient size as to fail to pass constitutional muster. As the majority opinion makes abundantly clear, no single percentage figure has been established as a concrete standard applicable in all cases. At 487. Violations of the Fourteenth Amendment do not hinge purely on numerical percentages. Each case must be examined "on the particular circumstances of the case." *Reynolds v. Sims*, 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964).

I disagree with the majority that the deviation in this case was not *de minimis*. I interpret their reasoning to be that wherever a deviation can be reduced by modifying the apportionment plan, a *prima facie* showing of a constitutional violation has been made requiring the intervention of the court. I know of no authority for such a broad proposition. Mathematical equality, while certainly desirable and the ultimate objective, is not absolutely required. *See Gaffney v. Cummings*, 412 U.S. 735, 745, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298 (1973) ("We

doubt that the Fourteenth Amendment requires repeated displacement of otherwise appropriate state decision-making in the name of essentially minor deviations from perfect census-population equality that no one, with confidence, can say will deprive any person of fair and effective representation in his state legislature." *Id.* at 749, 93 S.Ct. at 2329). The relative ease by which a deviation can be reduced must be balanced against the important federal policy of respecting the Board's reasonable judgment as to the proper and most effective size and make-up of its body. The district court cannot be allowed to simply substitute its own apportionment preferences for those of the Board. In *Upham,* the Supreme Court recently emphasized this consideration by quoting the following passage from *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973):

> "From the beginning, we have recognized that 'reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.' We have adhered to the view that state legislatures have 'primary jurisdiction' over legislative reapportionment ... Just as a federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution, we hold that a district court should similarly honor state policies in the context of congressional reapportionment. In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.' "

—— U.S. ——– ——, 102 S.Ct. 1518–21, 71 L.Ed.2d 725. And in *Gaffney,* the Court stated:

> Was the Master compelled, as a federal constitutional matter, to come up with a plan with smaller variations than were contained in appellees' plans? And what is to happen to the Master's plan if a resourceful mind hits upon a plan better than the Master's by a fraction of a percentage point? Involvements like this must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally "better" when measured against a rigid and unyielding population-equality standard.
>
> The point is, that such involvements should never begin. *We have repeatedly recognized that state reapportionment is the task of local legislatures or of those organs of state government selected to perform it. Their work should not be invalidated under the Equal Protection Clause when only minor population variations among districts are proved.*

412 U.S. at 750–51, 93 S.Ct. at 2330 (emphasis added).

In my opinion the majority has failed to adequately weigh this critical factor. Instead, only the ability to reduce the deviation is examined. In my view that is not enough. This decision fails to give adequate deference to the reasoned and good faith judgment of the Board and represents unjustified and unnecessary meddling by a federal court in the affairs of a local governmental body. While the district court and the majority consider the change in Board composition to be minor, I view it as a significant intrusion upon local governmental operations.

One other point should be briefly noted. Under the majority's reasoning, the question must be asked why stop at a 10–7 Board with a 1.86% deviation. If the Board were increased to 11–8, the deviation would be reduced to zero. Under the majority's position, there is no reason why such action should not now be taken.[1]

1. I also disagree with the majority's rejection of the Board's desire to remain at fifteen members

as a sufficient justification for support of the 15

For these reasons, I would find the deviation to be *de minimis* and must, therefore, respectfully dissent.

member Board. The size of any legislative body is an important element in the efficiency and effectiveness of its operations and the Board possesses every right to use it as a central element in its apportionment plan. Section 5(b) of the 1970 Illinois Constitution Transition Schedule provides that "the number of members . . . *shall be fifteen except. . . .*" (emphasis added). The district court and majority change it to effectively read "at any number but no less than fifteen." This change is a serious abuse of the provision's purpose.